# Exhibit A

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**ELECTRONICALLY FILED**
Superior Court of California
County of Alameda
02/14/2023
Chad Finke, Executive Officer / Clerk of the Court
By: _____ A. Linhares _____ Deputy

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

RITE AID CORPORATION, a Delaware Corporation

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

JANE DOE I, JANE DOE II, and JANE DOE III, on behalf of themselves and all others similarly situated

---

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

---

The name and address of the court is:
*(El nombre y dirección de la corte es):* Alameda County Superior Court

1225 Fallon St, Oakland, CA 94612

CASE NUMBER:
*(Número del Caso):* **23CV027782**

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
HammondLaw, P.C.; Julian Hammond; 1201 Pacific Ave., Suite 600, Tacoma WA, 98402; (310)-601-6766

DATE:
*(Fecha)* 02/14/2023  Chad Finke, Executive Officer / Clerk of the Court   Clerk, by _____ A. Linhares _____ , Deputy
*(Secretario)*    *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.

2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☑ on behalf of *(specify):* **RITE AID CORPORATION, a Delaware Corporation**

   under: ☑ CCP 416.10 (corporation)     ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*

4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courts.ca.gov

For your protection and privacy, please press the Clear
This Form button after you have printed the form.    Print this form    Save this form

| **SUPERIOR COURT OF CALIFORNIA COUNTY OF ALAMEDA** | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Rene C. Davidson Courthouse<br>Administration Building, 1221 Oak Street, Oakland, CA 94612 | **FILED**<br>Superior Court of California<br>County of Alameda<br>**02/15/2023**<br>Chad Finke, Executive Officer / Clerk of the Court<br>By: _____ A. Linhares _____ Deputy |
| PLAINTIFF:<br>Jane Doe, 1 et al | |
| DEFENDANT:<br>Ride Aid Corporation, a Delaware Corporation | |
| **NOTICE OF COMPLEX DETERMINATION HEARING** | CASE NUMBER:<br>23CV027782 |

TO THE PLAINTIFF(S)/ATTORNEY(S) FOR PLAINTIFF(S) OF RECORD:

You are ordered to serve all parties omitted from this notice or brought into the action after this notice was mailed.

Your Complex Determination Hearing has been scheduled on:

> Date: 03/28/2023    Time: 9:15 AM    Dept.: 23
>
> Location: Rene C. Davidson Courthouse
> Administration Building, 1221 Oak Street, Oakland, CA 94612

Pursuant to California Rules of Court, Rule 3.400 et seq. and Local Rule 3.250 (Unified Rules of the Superior Court, County of Alameda), the above-entitled matter is set for a Complex Determination Hearing.

The judge may place a tentative ruling in your case's on-line register of actions before the hearing. Check the court's eCourt Public Portal for each assigned department's procedures regarding tentative rulings at https://eportal.alameda.courts.ca.gov.

Form Approved for Mandatory Use
Superior Court of California,
County of Alameda
ALA CIV-100 [Rev. 11/2022]

**NOTICE OF COMPLEX DETERMINATION HEARING**

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF ALAMEDA | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Rene C. Davidson Courthouse<br>1225 Fallon Street, Oakland, CA 94612 | **FILED**<br>Superior Court of California<br>County of Alameda<br>02/15/2023<br>Chad Finke, Executive Officer/Clerk of the Court<br>By: _____ A. Linhares _____ Deputy |
| PLAINTIFF/PETITIONER:<br>Jane Doe, 1  et al | |
| DEFENDANT/RESPONDENT:<br>Ride Aid Corporation, a Delaware Corporation | |
| **CERTIFICATE OF MAILING** | CASE NUMBER:<br>23CV027782 |

**I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Notice of Complex Determination Hearing upon each party or counsel named below by placing the document for collection and mailing so as to cause it to be deposited in the United States mail at the courthouse in Oakland, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid, in accordance with standard court practices.**

Julian Hammond
HAMMONDLAW PC
1201 Pacific Ave Suite 600
Tacoma, WA 98402

Chad Finke, Executive Officer / Clerk of the Court

Dated: 02/15/2023                              By:

A. Linhares, Deputy Clerk

**CERTIFICATE OF MAILING**

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| HammondLaw PC; Julian Hammond (SBN 268489)<br>1201 Pacific Ave, Suite 600, Tacoma, WA 98402<br>TELEPHONE NO.: 310 601 6766    FAX NO. (Optional): 310 295 2385<br>E-MAIL ADDRESS: jhammond@hammondlawpc.com<br>ATTORNEY FOR (Name): JANE DOE I. JANE DOE II. and JANE DOE III | **ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of Alameda<br>**02/14/2023 at 12:00:00 AM**<br>By: Angela Linhares,<br>Deputy Clerk |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF Alameda**
STREET ADDRESS:
MAILING ADDRESS: 1225 Fallon St
CITY AND ZIP CODE: Oakland 94612
BRANCH NAME: REne C Davidson

CASE NAME:
Jane Doe 1 et al v Rite Aid Corporation

| **CIVIL CASE COVER SHEET** | | **Complex Case Designation** | CASE NUMBER: |
|---|---|---|---|
| [x] **Unlimited**<br>(Amount<br>demanded<br>exceeds $25,000) | [ ] **Limited**<br>(Amount<br>demanded is<br>$25,000 or less) | [ ] Counter  [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | **23CV027782**<br>JUDGE:<br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[x] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint (not specified above) (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition (not specified above) (43)

2. This case [✓] is    [ ] is not    complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [x] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [x] Substantial amount of documentary evidence
   d. [x] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [x] Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. [x] monetary  b. [x] nonmonetary; declaratory or injunctive relief  c. [x] punitive
4. Number of causes of action (specify): See attachment
5. This case [x] is    [ ] is not    a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: 2/13/23
Julian Hammond
_____(TYPE OR PRINT NAME)_____     ►     _____(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)_____

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California      **CIVIL CASE COVER SHEET**      Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10

**INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET**                    **CM-010**

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

**CASE TYPES AND EXAMPLES**

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice– Physicians & Surgeons
  Other Professional Health Care Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip and fall)
  Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  Intentional Infliction of Emotional Distress
  Negligent Infliction of Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/ Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court Case Matter
  Writ–Other Limited Court Case Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
  Confession of Judgment *(non-domestic relations)*
  Sister State Judgment
  Administrative Agency Award *(not unpaid taxes)*
  Petition/Certification of Entry of Judgment on Unpaid Taxes
  Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-harassment)*
  Mechanics Lien
  Other Commercial Complaint Case *(non-tort/non-complex)*
  Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late Claim
  Other Civil Petition

For your protection and privacy, please press the Clear

**ATTACHMENT TO CIVIL CASE COVER SHEET**

4. Number of causes of action (specify):

(1) Invasion of Privacy—Intrusion into Private Matters;
(2) Invasion of Privacy and Violation of California Constitution, Art. 1, § 1;
(3) Violation of Confidentiality of Medical Information Act (CMIA), California Civil Code §
     56.101;
(4) Violation of CMIA, California Civil Code § 56.10;
(5) Violation of California Invasion of Privacy Act (CIPA), Penal Code §§ 630, *et seq.*;
(6) Breach of Contract;
(7) Breach of Implied Contract (in the alternative); and
(8) Violation of Business & Professions Code §§ 17200 *et seq.* (UCL)

| | |
|---|---|
| # SUPERIOR COURT OF CALIFORNIA<br>## COUNTY OF ALAMEDA<br><br>COURTHOUSE ADDRESS:<br>Rene C. Davidson Courthouse<br>Administration Building, 1221 Oak Street, Oakland, CA 94612 | Reserved for Clerk's File Stamp<br><br>**FILED**<br>Superior Court of California<br>County of Alameda<br><br>**02/14/2023**<br><br>Chad Finke , Executive Officer / Clerk of the Court<br>By: _____ A. Linhares _____ Deputy |

| | |
|---|---|
| PLAINTIFF:<br>Jane Doe, 1  et al | |
| DEFENDANT:<br>Ride Aid Corporation, a Delaware Corporation | |
| **NOTICE OF CASE MANAGEMENT CONFERENCE** | CASE NUMBER:<br>23CV027782 |

TO THE PLAINTIFF(S)/ATTORNY(S) FOR PLAINTIFF(S) OF RECORD:

You are ordered to serve all named defendants and file proofs of service on those defendants with the court within 60 days of the filing of the complaint (Cal. Rules of Court, 3.110(b)).

Give notice of this conference to all other parties and file proof of service.

Your Case Management Conference has been scheduled on:

| | |
|---|---|
| Date: 06/14/2023    Time: 8:30 AM    Dept.: 23 | |
| Location: Rene C. Davidson Courthouse<br>Administration Building, 1221 Oak Street, Oakland, CA 94612 | |

TO DEFENDANT(S)/ATTORNEY(S) FOR DEFENDANT(S) OF RECORD:

The setting of the Case Management Conference does not exempt the defendant from filing a responsive pleading as required by law, you must respond as stated on the summons.

TO ALL PARTIES who have appeared before the date of the conference must:

Pursuant to California Rules of Court, 3.725, a completed Case Management Statement (Judicial Council form CM-110) must be filed and served at least 15 calendar days before the Case Management Conference. The Case Management Statement may be filed jointly by all parties/attorneys of record or individually by each party/attorney of record.

**Meet and confer**, in person or by telephone as required by Cal. Rules of Court, rule 3.724.

**Post jury fees** as required by Code of Civil Procedure section 631.

If you do not follow the orders above, the court may issue an order to show cause why you should not be sanctioned under Cal. Rules of Court, rule 2.30. Sanctions may include monetary sanctions, striking pleadings or dismissal of the action.

The judge may place a Tentative Case Management Order in your case's on-line register of actions before the conference. This order may establish a discovery schedule, set a trial date or refer the case to Alternate Dispute Resolution, such as mediation or arbitration. Check the court's eCourt Public Portal for each assigned department's procedures regarding tentative case management orders at https://eportal.alameda.courts.ca.gov.

Form Approved for Mandatory Use
Superior Court of California,
County of Alameda
ALA CIV-100 [Rev. 10/2021]

# NOTICE OF
# CASE MANAGEMENT CONFERENCE

| **SUPERIOR COURT OF CALIFORNIA COUNTY OF ALAMEDA** | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Rene C. Davidson Courthouse<br>1225 Fallon Street, Oakland, CA 94612 | **FILED**<br>Superior Court of California<br>County of Alameda<br>02/14/2023<br>Chad Finke , Executive Officer / Clerk of the Court<br>By: _____ A. Linhares _____ Deputy |
| PLAINTIFF/PETITIONER:<br>Jane Doe, 1  et al | |
| DEFENDANT/RESPONDENT:<br>Ride Aid Corporation, a Delaware Corporation | |
| **CERTIFICATE OF MAILING** | CASE NUMBER:<br>23CV027782 |

**I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Notice of Case Management Conference upon each party or counsel named below by placing the document for collection and mailing so as to cause it to be deposited in the United States mail at the courthouse in Oakland, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid, in accordance with standard court practices.**

Julian Hammond
HAMMONDLAW PC
1201 Pacific Ave Suite 600
Tacoma, WA 98402

Chad Finke, Executive Officer / Clerk of the Court

Dated: 02/15/2023

By:

A. Linhares, Deputy Clerk

**CERTIFICATE OF MAILING**

1   JULIAN HAMMOND (SBN 268489)
    jhammond@hammondlawpc.com
2   ADRIAN BARNES (SBN 253131)
    abarnes@hammondlawpc.com
3   ARI CHERNIAK (SBN 290071)
    acherniak@hammondlawpc.com
4   POLINA BRANDLER (SBN 269086)
    pbrandler@hammondlawpc.com
5   HAMMONDLAW, P.C.
    1201 Pacific Ave, 6th Floor
6   Tacoma, WA 98402
    (310) 601-6766
7   (310) 295-2385 (Fax)

8   *Attorneys for Plaintiffs and the Putative Classes*

9

**ELECTRONICALLY FILED**
Superior Court of California,
County of Alameda
**02/14/2023 at 12:00:00 AM**
By: Angela Linhares,
Deputy Clerk

10              **SUPERIOR COURT FOR THE STATE OF CALIFORNIA**

11                             **COUNTY OF ALAMEDA**

12

13   **JANE DOE I, JANE DOE II,** and **JANE DOE**
     **III**, on behalf of themselves and all others
14   similarly situated,

15              Plaintiffs,

16   vs.

17

18   **RITE AID CORPORATION**, a Delaware
19   Corporation,

20              Defendant.

21

22

23

24

25

26

CASE NO.   23CV027782

**CLASS ACTION COMPLAINT FOR:**

(1) **Invasion of Privacy—Intrusion into**
    **Private Matters;**
(2) **Invasion of Privacy and Violation of**
    **California Constitution, Art. 1, § 1;**
(3) **Violation of Confidentiality of Medical**
    **Information Act (CMIA), California Civil**
    **Code § 56.101;**
(4) **Violation of CMIA, California Civil Code**
    **§ 56.10;**
(5) **Violation of California Invasion of Privacy**
    **Act (CIPA), Penal Code §§ 630,** *et seq.***;**
(6) **Breach of Contract;**
(7) **Breach of Implied Contract (in the**
    **alternative); and**
(8) **Violation of Business & Professions Code**
    **§§ 17200** *et seq.* **(UCL)**

**DEMAND FOR JURY TRIAL**

CLASS ACTION COMPLAINT

Plaintiffs Jane Doe I, Jane Doe II, and Jane Doe III ("Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their attorneys of record, HammondLaw, P.C., complain and allege the following, based upon personal knowledge, where applicable, information and belief, and the investigation of counsel:

## **INTRODUCTION**

1.     This is a privacy class action under California Code of Civil Procedure § 382 seeking damages (including but not limited to compensatory, statutory, and punitive damages), civil penalties, restitution, disgorgement of profits, declaratory relief, and reasonable attorney's fees and costs pursuant to California Business & Professions Code § 17203, Civil Code §§ 56.35, 56.36, Penal Code § 637.2, and Code of Civil Procedure § 1021.5 on behalf of the members of the class, as defined below.

2.     During the Class Period, Defendant Rite Aid Corporation (hereinafter, "Rite Aid" or "Defendant") operated one of the largest chains of pharmacies in the United States, delivering health care services and retail products to over one million Americans daily.[1] As of February 26, 2022, Defendant operated 2,450 retail drugstores, with 526 stores in California.[2] Defendant also maintained and operated, and continues to maintain and operate, a website – https://www.riteaid.com – through which its customers can, among other things, learn about Defendant's services, find Rite Aid stores, fill their prescriptions, book various medical tests, schedule a number of different vaccinations, and otherwise interact with Defendant.[3]

3.     In the most recent reported year, fiscal 2022 (52 weeks ending Feb. 26, 2022), one of the primary focuses of Rite Aid's marketing activities was "[d]riving the awareness of COVID-19 vaccination and testing, as well as flu and ancillary immunizations."[4] Rite Aid also reported "delivering 14 million [COVID-19] vaccine doses," and stated that "Pharmacy same store sales increased 7.9%" in fiscal 2022,

---

[1] Rite Aid Corporation, Fiscal 2022 Annual Report, Form 10-K, p. 5 (2022) (https://s27.q4cdn.com/633053956/files/doc_financials/2022/ar/d3b229ff-5147-4849-bfe1-13cec0816db9.pdf).
[2] *Id.* at p. 41.
[3] Rite Aid Home Page, https://www.riteaid.com (last visited, Feb. 7, 2023).
[4] Rite Aid Corporation, Fiscal 2022 Annual Report, Form 10-K, pp. 11-12 (2022) (https://s27.q4cdn.com/633053956/files/doc_financials/2022/ar/d3b229ff-5147-4849-bfe1-13cec0816db9.pdf).

and that this was due, in part, to Rite Aid's "COVID-19 vaccination program."[5] In that same year, the revenue achieved by Rite Aid's Retail Pharmacy Segment was $17.49 billion.[6]

4.      When Plaintiffs and other customers used Defendant's website in order to make a vaccination appointment, they were required to provide personal information, including their first name, last name, street address, city, state, zip code, sex assigned at birth, race, and whether they are of "Hispanic, Latino/Latina, or Spanish Origin?."

5.      Plaintiffs and other customers were subsequently required to provide details of their medical history including answers to questions such as, for example: "Do you have a neurological disorder such as seizures or other disorders that affect the brain or have had a disorder that resulted from a vaccine (e.g. Guillain-Barre Syndrome)?" "Have you had a shingles vaccine?" "Have you had a whooping cough (Tdap/Td) vaccine?" "Do you have a long term health problem with lung disease or asthma?" "During the past year, have you received a transfusion of blood or blood products, including antibodies?" "Are you pregnant or could you become pregnant in the next three months?"

6.      Unbeknownst to Plaintiffs and other customers, the answers they gave to these questions, along with their personal information and personal identifiers, were secretly disclosed to Meta Platforms, Inc. (formerly known as Facebook) ("Meta" or "Facebook"), an unauthorized third party.

7.      Through the Meta Pixel, a tracking tool intentionally incorporated by Rite Aid in its website source code or otherwise affirmatively permitted on its website by Rite Aid, for customers who made a vaccination appointment, including Plaintiffs, Defendant disclosed individually identifying information and information regarding their medical history, mental and physical condition, and treatment (hereinafter "Medical Information"), to Meta, all without its customers' knowledge and/or consent.

8.      Thus, through its actions and practices, Rite Aid has disclosed and released Medical Information to Meta. This massive breach of confidentiality and privacy has, on information and belief, affected millions of Class Members in the state of California.

9.      Plaintiffs bring this class action on behalf of themselves and all natural persons residing in California who used Defendant's website to make a vaccination appointment and whose Medical Information was disclosed or transmitted to Meta or any other unauthorized third party (hereinafter, "Class Members").

---

[5] *Id.* at pp. 7, 56.
[6] *Id.* at p. 55.

10.     Rite Aid's actions constitute an extreme invasion of Plaintiffs' and Class Members' privacy. Rite Aid's actions also violated common law, the California Constitution, and numerous state statutes.

## PARTIES

11.     Plaintiff Jane Doe I, is a citizen of California, residing in Cerritos, Los Angeles County, California. Plaintiff Jane Doe I used Defendant's website to book a vaccination appointment in or about April 2021. On information and belief, her Medical Information was disclosed to Meta without her knowledge, consent, or authorization.

12.     Plaintiff Jane Doe II, is a citizen of California, residing in Van Nuys, Los Angeles County, California. Plaintiff Jane Doe II used Defendant's website to book a vaccination appointment in or about March 2021. On information and belief, her Medical Information was disclosed to Meta without her knowledge, consent, or authorization.

13.     Plaintiff Jane Doe III, is a citizen of California, residing in Brea, Orange County, California. Plaintiff Jane Doe III used Defendant's website to book a vaccination appointment in or about April 2022. On information and belief, her Medical Information was disclosed to Meta without her knowledge, consent, or authorization.

14.     Defendant Rite Aid Corporation, is a Delaware Corporation. Rite Aid's principal place of business, as listed with the California Secretary of State, is 30 Hunter Lane, Camp Hill, Pennsylvania 17011. On information and belief, Rite Aid has moved its corporate headquarters and principal place of business to 1200 Intrepid Avenue, 2nd Floor, Philadelphia, Pennsylvania 19112.

## JURISDICTION

15.     This Court has jurisdiction over Plaintiffs' and Class Members' claims for compensatory damages, disgorgement of profits, and punitive damages arising from Defendant's invasion of privacy and violation of Article 1, Section 1 of the California Constitution.

16.     This Court has jurisdiction over Plaintiffs' and Class Members' claims for nominal damages, actual damages, statutory damages, punitive damages, and reasonable attorneys' fees and costs arising from Defendant's violation of the California Confidentiality of Medical Information Act, Cal. Civil Code §§ 56 *et seq.*

17.     This Court has jurisdiction over Plaintiffs' and Class Members' claims for statutory damages of $5,000 per violation, or three times the amount of actual damages, arising from Defendant's violation of the California Invasion of Privacy Act, Penal Code §§ 630 *et seq.*

18. This Court has jurisdiction over Plaintiffs' and Class Members' claims for breach of contract and, in the alternative, breach of implied contract.

19. This Court has jurisdiction over Plaintiffs' and Class Members' claims for restitution and declaratory and injunctive relief arising from Defendant's unlawful, unfair, and fraudulent business practices under Cal. Bus. & Prof. Code §§ 17200 *et seq.*

20. This Court has jurisdiction over Plaintiffs' and Class Members' claims for reasonable attorneys' fees and costs pursuant to § 1021.5 of the California Code of Civil Procedure.

21. This Court has personal jurisdiction over the parties because Defendant has continuously and systematically conducted business in the State of California. Likewise, Plaintiffs are California residents whose rights were violated in the State of California as a result of their contact with Defendant from and within California.

## VENUE

22. Venue is proper in this Court pursuant to California Code of Civil Procedure § 395. Defendant is a foreign corporation and has not designated with the California Secretary of State a principal place of business in California. Thus, venue is proper in any county within California.

## FACTUAL BACKGROUND

### *In Order for Plaintiffs and Class Members to Make Vaccination Appointments on its Website, Defendant Required Them to Input Medical Information*

23. Throughout the Class Period, Defendant maintained and operated websites (including www.riteaid.com), through which Defendant has encouraged and permitted consumers to make appointments for a variety of vaccinations, including vaccinations for: COVID-19; flu; shingles; Tdap (Tetanus, Diphtheria, Pertussis); DTaP (Diphtheria, Tetanus, Pertussis); Hepatitis A & B; Hepatitis A; Hepatitis B; HPV; Meningitis; Measles, Mumps, & Rubella; and, Chicken Pox (Varicella).

24. To begin the process of making a vaccination appointment, when a Class Member visited Defendant's website they could, from the home page, click on the "Schedule Vaccinations" button. Having clicked on that button, the Class Member would be taken to a page with the heading "Schedule an Appointment," and would be required to enter her ZIP code and the "Vaccine recipient's date of birth (MM/DD/YYYY)", and to select the type of immunization needed. Depending on the type of immunization selected, the Class Member would be asked whether he or she had received a dose of that immunization before, or, in the case of a COVID-19 vaccine, he or she would be asked for details of the particular type of vaccine required and information about previous COVID-19 vaccines he or she had received.

25.     Next, the Class Member would be presented with a list of Rite Aid Pharmacy locations and, under each location, one or more dates with available vaccination appointments. The Class Member would then click on one of those available dates at one location, and be presented with a number of available appointment times from which she could click on a time and then click another button to "Select Appointment."

26.     Having selected an appointment, the Class Member would then be required to fill in a form entitled "Recipient Information" in which the Class Member would provide the following information: first name; last name; street address; city; state; zip code; sex assigned at birth; race; whether they are Hispanic, Latino/Latina, or Spanish origin; and last 4 digits of Social Security Number or the fact that they do not have a Social Security Number.

27.     The next step would be for the Class Member to provide his or her own phone number and to select a language preference for communications including a confirmation of the appointment and reminders.

28.     Having provided his or her contact information, the Class Member would be taken to a page entitled "Vaccine history" and required to answer a number of questions about his or her medical history, physical condition, and treatment. These questions, which could be answered by selecting "Yes", "No", or "Don't Know," include: "Do you have allergies to medications, food (e.g. eggs), latex or any vaccine component (e.g. neomycin, formaldehyde, gentamicin, thimerosal, bovine protein, phenol, polymyxin, gelatin, baker's yeast or yeast)?" "Have you received a vaccine in the past 4 weeks?" "Have you ever had a serious reaction after receiving a vaccination?" "Do you have a neurological disorder such as seizures or other disorders that affect the brain or have had a disorder that resulted from a vaccine (e.g. Guillain-Barre Syndrome)?" "Have you had a pneumococcal vaccine? (You may need two different pneumococcal shots.)" "Have you had a shingles vaccine?" "Have you had a whooping cough (Tdap/Td) vaccine?"

29.     After completing the "Vaccine history" form, the Class Member could click a button marked "Next" and proceed to a page entitled "Health information." On this page, the Class Member would be required to answer a number of questions about his or her medical history, physical condition, and treatment. These questions include: "Do you have any long-term health problems with heart disease, kidney disease, metabolic disorder (e.g. diabetes), anemia , or blood disorders?" "Do you have a long term health problem with lung disease or asthma?" "Do you have cancer, leukemia, AIDS, or any other immune system problem? (In some circumstances you may be referred to your physician.)" "Do you take prednisone, other steroids, or anticancer drugs, or have you had radiation treatments?" "During the past

year, have you received a transfusion of blood or blood products, including antibodies?" "Do you use any nicotine products?." The Class Member would also be prompted to answer the option question of whether he or she had any other medical conditions, and to type a response.

30. The next page, entitled "Caregiving & Pregnancy," required the Class Member to answer two required questions: "Are you a parent, family member, or caregiver to a newborn infant?" "Are you pregnant or could you become pregnant in the next three months?"

31. The Class Member would, next, reach a page on which he or she could confirm the appointment. To confirm the appointment, the Class Member would have to enter an electronic signature. Above the electronic signature would be a number of statements and acknowledgements, including the following: "I, as the vaccine recipient or legal guardian/parent of a minor child vaccine recipient, authorize the release of any medical or other information with respect to this vaccine to specified healthcare providers, Medicare, Medicaid or other third party payer as needed and request payment of authorized benefits to be made on my or the vaccine recipient's behalf to Rite Aid."; "I acknowledge that the vaccination record may be shared with federal or state or city agencies for registry reporting."; "I acknowledge receipt of Rite Aid's Notice of Privacy Practices for Protected Health Information."; "I acknowledge that the administration of an immunization or vaccine does not substitute for an annual check-up with the vaccine recipient's primary care physician."; "For CA: I acknowledge that Rite Aid intends to share the vaccination record with the California Immunization Registry (CAIR) and that I have reviewed the 'CAIR Immunization Notice to Patients and Parents' attached to this form."; and, "For CA: I acknowledge that if I do not want the immunization information shared with other CAIR users, I must complete and submit to CAIR a "Decline or Start Sharing/Information Request Form" obtained either from the pharmacy or downloaded from the CAIR website." The underlined terms in the above statements and acknowledgements were hyperlinks to Rite Aid's Notice of Privacy Practices and to the CAIR website, respectively.

32. On information and belief, throughout the Class Period, the process for making a vaccination appointment on Defendant's website has been substantially the same.

33. Thus, in order to use Defendant's website to schedule a vaccination appointment, Plaintiffs and other Class Members were required by Defendant's website to enter confidential, private, and sensitive personal and health information into the website.

***Defendant's Notice of Privacy Practices Promised that Plaintiffs' and Class Members' Medical Information Would be Safeguarded and Not Disclosed to Unauthorized Third Parties***

34.     Defendant's Notice of Privacy Practices, posted on its website, and substantively identical in pertinent parts throughout the Class Period, describes, "in accordance with the Health Insurance Portability and Accountability Act of 1996 ('HIPAA') Privacy Rule, how Rite Aid may use and disclose [customers'] protected health information [PHI] to carry out treatment, payment or health care operations and for other specific purposes that are permitted or required by law."

35.     The Notice of Privacy Practices sets out certain limited uses of protected health information for the purposes of "Treatment, Payment and Health Care Operations." It states: "We will use your [PHI] to treat you," We will use your [PHI] to obtain payment for products and services," and "We will use your [PHI] to carry out health care operations." After each of these statements, the Notice of Privacy Practices provides additional detail about how a customer's PHI might be used for each respective purpose.

36.     The Notice of Privacy Practices then sets out "uses and disclosures that are either permitted or required by the HIPAA Privacy Rule." The Notice explains: "Using their professional judgment, our pharmacists may disclose your protected health information to a family member, other relative, close personal friend, or any person you identify as being involved in your health care. This could include allowing those persons to pick up filled prescriptions, medical supplies, or medical records on your behalf. We may enter into contracts with some entities known as Business Associates that perform services for us. For example, we sometimes engage Business Associates to sort insurance or other third party payor claims for submission to the actual payor. We may disclose protected health information to our Business Associates so that they can perform their services and then bill your third party payor for services rendered. We require the Business Associates to appropriately safeguard the protected health information."

37.     Next, the Notice of Privacy Practices details "other required or permitted disclosures of [PHI]." The Notice contains an exhaustive list of these other potential disclosures, including, for example: "to law enforcement agencies as required by law or in response to a valid subpoena or other legal process," "to a coroner or medical examiner when necessary, for example, to identify a deceased person or to determine a cause of death, or to funeral directors consistent with applicable law to carry out their duties," "when necessary to prevent a serious threat to the patient's health and safety or the health and safety of the public or another person," and "to authorized federal officials so they may provide protection to the President, other authorized persons, or foreign heads of state or conduct special investigations."

38.     The Notice of Privacy Practices then provides: "We will obtain your written Authorization before using or disclosing protected health information about you for marketing purposes, to sell your

protected health information, or for purposes other than those listed above or otherwise permitted or required by law. You may revoke an Authorization in writing at any time. Such revocations must be made in writing. Upon receipt of the written revocation, we will stop using or disclosing protected health information about you, except to the extent that we have already taken action in reliance on the Authorization." (emphasis added).

39.     Plaintiffs' and Class Members' Medical Information, as that term is defined in this Complaint, is "protected health information" within the meaning of HIPAA and, thus, Defendant's Notice of Privacy Practices.

### *Defendant Secretly Disclosed, and Permitted Meta to Intercept, Plaintiffs' and Class Members' Medical Information*

40.     Completely unbeknownst to Plaintiffs and other Class Members, and continuing to the present, Medical Information that they communicated to Defendant through Defendant's website while making a vaccination appointment was intercepted by and/or disclosed to at least one unauthorized third party: Meta.

### *Meta's Platform and the Meta Pixel*

41.     Meta operates the world's largest social media company.

42.     Meta maintains profiles on users that include users' real names, locations, email addresses, friends, likes, and communications that Meta associates with personal identifiers including IP addresses and cookie identifiers.

43.     Facebook users are allowed only one account and must share the name they go by in everyday life.

44.     Meta also tracks non-users across the web through its widespread Internet marketing products and source code.

45.     Meta's revenue is derived almost entirely from selling targeted advertising to Facebook users on Facebook.com and to all internet users on non-Facebook sites that integrate Meta marketing source code on their websites.

46.     Meta sells advertising space by highlighting its ability to target users. Meta can target users so effectively because it tracks Facebook's users' activity both on and off its site. This allows Meta to draw inferences about users beyond what they explicitly disclose on their Facebook accounts. Meta compiles this information into a generalized dataset called "Core Audiences," to which advertisers can apply specific filters and parameters in order to generate a target audience for their advertisements.

47.    Advertisers are also able to build "Custom Audiences." Advertisers can use "customer lists, website or app traffic, or engagement across Facebook technologies, to create Custom Audiences of people who already know [their] business."[7] Moreover, Advertisers are able to use their Custom Audience to create a Lookalike Audience. To create a Lookalike Audience, Facebook "leverages information such as demographics, interests and behaviors from [the advertiser's source Custom Audience] to find new people who share similar qualities." Using a Lookalike Audience allows an advertiser to deliver its advertisements to an "audience of people who are similar to (or 'look like') [its] existing customers."[8]

48.    One method by which an Advertiser can create a Custom Audience, and consequently a Lookalike Audience, is from the Advertiser's website. In order to create a "website Custom Audience" an Advertiser's website must have an active Meta Pixel.[9]

49.    The Meta Pixel is offered to advertisers, like Rite Aid, to integrate into their websites. Once installed on a website, "the [P]ixel will log when someone takes an action on [that] website."[10] As Facebook explains, "[t]he Meta Pixel receives information about the actions, or events, that take place on [an advertiser's] website."[11] Automatic events are a category of actions that the Meta Pixel collects and transmits from the website where it is installed without the advertiser being required to add any additional code.[12] The collection and transmission of automatic events is sufficient for an Advertiser to create a Custom Audience and, consequently, a Lookalike Audience. Advertisers are also able to select from a set of Standard events, predefined by Facebook, which can also be collected and transmitted by the Meta

---

[7] Facebook, About Customer Audiences,
https://www.facebook.com/business/help/744354708981227?id=2469097953376494 (last visited Jan. 18, 2023).

[8] Facebook, About Lookalike Audiences,
https://www.facebook.com/business/help/164749007013531?id=401668390442328 (last visited Jan. 18, 2023).

[9] Facebook, Create a Website Custom Audience,
https://www.facebook.com/business/help/1474662202748341?id=2469097953376494 (last visited Jan. 18, 2023).

[10] Facebook, About Meta Pixel,
https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Jan. 18, 2023).

[11] Facebook, About Automatic Events,
https://www.facebook.com/business/help/1292598407460746?id=1205376682832142 (last visited Jan. 18, 2023).

[12] *Id.*

Pixel, including, for example, what content a visitor views, subscribes to, or purchases.[13] Finally, Advertisers are able to create their own "custom events" to be tracked and transmitted to Facebook by the Meta Pixel.[14]

50.      When a user accesses a website hosting a Meta Pixel, Facebook's software script surreptitiously directs the user's computing device to send a separate message to Facebook's servers. This second transmission, completely invisible and unknown to the user, contains the content of the original request sent to the host website ("GET request"), along with the data that the Meta Pixel was configured to collect ("POST request"). GET and POST requests are communications that contain contents from both the user and from servers associated with the website they are visiting. These transmissions are initiated by Meta code and concurrent with the communications to and from the host website.

51.      The Meta Pixel acts as a conduit of information, sending the information it collects to Meta through scripts running in the user's web browser. The information is sent in data packets labelled with personally identifiable information, including the user's IP address.

52.      Meta associates the information it obtains via Meta Pixel with other information regarding the user, using additional personal identifiers that are transmitted concurrently with other personal information the Pixel is configured to collect. If the user has a Facebook account, these identifiers include the "c_user" IDs, which allow Meta to link data to a particular Facebook account, and "xs" cookies associated with a browsing session. For both Facebook account-holders and users who do not have a Facebook account, these identifiers also include cookies that Meta ties to their browser, such as "datr" and "fr" cookies.[15]

53.      The c-user cookie is a means of identification for Facebook users. The c_user cookie value is the Facebook equivalent of a user identification number. Each Facebook user account has a unique c_user cookie. Facebook uses the c_user cookie to record user activities and communications.

54.      Any computer user can find the Facebook account associated with a particular c-user cookie. One simply needs to log-in to Facebook, then type www.facebook.com/[c-user cookie]. For

---

[13] Facebook, Specifications for Meta Pixel Standard Events, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited Jan. 18, 2023).

[14] Facebook, About Standard and Custom Website Events, https://www.facebook.com/business/help/964258670337005?id=1205376682832142 (last visited]. Jan. 18, 2023).

[15] Meta, *Cookies Policy* (Oct. 5, 2022), https://www.facebook.com/policy/cookies.

example, the c-user cookie for Mark Zuckerberg is 4. Logging in to Facebook and typing www.facebook.com/4 in the web browser will retrieve Mark Zuckerberg's Facebook page.

55.     The _datr cookie identifies the patient's specific web browser from which the patient is sending the communication. It is an identifier that is unique to the patient's specific web browser and is therefore a means of identification for Facebook users and non-users. Facebook keeps a record of every _datr cookie identifier associated with each of its users.

56.     The _fr cookie is a Facebook identifier that is an encrypted combination of the c_user and _datr cookies.

57.     Meta warns developers and those who incorporate the Meta Pixel into their website that the Meta Pixel is a personal identifier because it "relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts."[16]

58.     The Meta Pixel also automatically captures and discloses the IP address of the user. IP addresses are used to identify and route communications on the Internet. IP addresses of individual Internet users are used by websites and tracking companies to facilitate and track Internet communications. Individual homes and their occupants can be, and are, tracked and targeted with advertising using IP addresses. Thus, IP addresses are personally identifiable, particularly in combination with other information disclosed through the Meta Pixel.

*Defendant Disclosed Plaintiffs' and Class Members' Medical Information to Meta and Used Plaintiffs' and Class Members' Medical Information for its Own Purposes*

59.     Starting on date unknown and continuing to the present, Defendant embedded the Meta Pixel on and throughout its website and transmitted Medical Information shared by Plaintiffs and Class Members, without their consent, to Meta in accordance with the Meta Pixel's configuration.

60.     Rite Aid installed the Meta Pixel on its website – www.riteaid.com. When a Plaintiff or another Class Member visited that website and completed the steps necessary to make a vaccination appointment, the Meta Pixel automatically caused the Plaintiff's or Class Member's personal identifiers, including IP addresses and the c_user, _fr, _datr, and _fbp cookies, to be transmitted to Meta, attached to the fact that the Plaintiff or Class Member had visited the website and the titles of the webpages the Plaintiff or Class Member visited.

---

[16] Facebook, Get Started, https://developers.facebook.com/docs/meta-pixel/get-started (last visited Jan. 18, 2023).

61.     Rather than merely transmit the "automatic events" that the Meta Pixel automatically collects and transmits from a website without the website owner or developer being required to add any additional code, on information and belief, Defendant intentionally configured the Meta Pixel on its website to track, collect, and disclose "custom events" such as:

a.  the time of the vaccination appointment, and, on information and belief, the ID number of the Rite Aid store at which the appointment was made;

b.  certain personal information entered by Class Members the state of their street address, sex assigned at birth, and race;

c.  answers given by Class Members on the "Vaccine history" page, including answers to questions such as: "Do you have allergies to medications, food (e.g. eggs), latex or any vaccine component (e.g. neomycin, formaldehyde, gentamicin, thimerosal, bovine protein, phenol, polymyxin, gelatin, baker's yeast or yeast)?" "Have you received a vaccine in the past 4 weeks?" "Have you ever had a serious reaction after receiving a vaccination?" "Do you have a neurological disorder such as seizures or other disorders that affect the brain or have had a disorder that resulted from a vaccine (e.g. Guillain-Barre Syndrome)?" "Have you had a pneumococcal vaccine? (You may need two different pneumococcal shots.)" "Have you had a shingles vaccine?" "Have you had a whooping cough (Tdap/Td) vaccine?";

d.  answers given by Class Members on the "Health information" page, including answers to questions such as: "Do you have any long-term health problems with heart disease, kidney disease, metabolic disorder (e.g. diabetes), anemia , or blood disorders?" "Do you have a long term health problem with lung disease or asthma?" "Do you have cancer, leukemia, AIDS, or any other immune system problem? (In some circumstances you may be referred to your physician.)" "Do you take prednisone, other steroids, or anticancer drugs, or have you had radiation treatments?" "During the past year, have you received a transfusion of blood or blood products, including antibodies?" "Do you use any nicotine products?"; and,

e.  answers given by Class Members on the "Caregiving & Pregnancy" page to the questions: "Are you a parent, family member, or caregiver to a newborn infant?" "Are you pregnant or could you become pregnant in the next three months?"

62.     Moreover, the Meta Pixel on Defendant's website was also intentionally configured or authorized to use a feature called "automatic advanced matching." That feature scans forms on a website looking for fields that may contain personally identifiable information like a first name, last name, or

email address, and then causes that information to be disclosed to Meta. On Defendant's website this feature collected, at a minimum, the first names and last names of Plaintiffs and other Class Members entered on the Recipient Information page of the vaccination scheduling tool.

63.     The data collected by the automatic advanced matching feature is disclosed to Meta in an obfuscated form know as a "hash." But Meta is able to determine the pre-obfuscated version of the data. Indeed, Meta uses the hashed information to link other data collected and disclosed by the Meta Pixel to Plaintiffs' and Class Members' Facebook and Instagram profiles.

64.     Thus, put simply, when Plaintiffs or other Class Members used Defendant's website to schedule a vaccination appointment, their identities, personal identifiers, and health information (together their Medical Information) was disclosed to Meta.

65.     On information and belief, Defendant disclosed Plaintiffs' and Class Members' Medical Information to Meta in order to permit Defendant to improve its marketing and advertising. Thus, Defendant used Plaintiffs' and Class Members' Medical Information for its own marketing and advertising purposes.

***Defendant Used and Disclosed Plaintiffs' and Class Members' Medical Information Without Plaintiffs' or Class Members' Knowledge, Consent, Authorization, or Further Action***

66.     The tracking tools incorporated into, embedded in, or otherwise permitted on Defendant's website were invisible to Plaintiffs and Class Members while using that website. The Meta Pixels on Defendant's website were seamlessly integrated into the website such that there was no reason for Plaintiffs or any Class Member to be aware of or to discover their presence.

67.     Plaintiffs and Class Members were shown no disclaimer or warning that their Medical Information would be disclosed to any unauthorized third party without their express consent.

68.     Plaintiffs and Class Members had no idea that their Medical Information was being collected and transmitted to an unauthorized third party.

69.     Because Plaintiffs and Class Members had no idea of the presence of Meta Pixels on Defendant's website, or that their Medical Information would be collected and transmitted to Meta, they could not and did not consent to Rite Aid's conduct.

70.     Plaintiffs and Class Members did not give consent or authorization for Defendant to disclose their Medical Information to Meta or to any third party for marketing purposes.

71.     Moreover, Defendant's Notice of Privacy Practices, as described above, provided no indication to Plaintiffs or Class Members that their Medical Information would be disclosed to Meta or any unauthorized third party.

***Plaintiffs and Class Members Had a Reasonable Expectation of Privacy in the Medical Information they Provided to Defendant***

72. Plaintiffs and Class Members had a reasonable expectation of privacy in their Medical Information.

73. Information such as the Medical Information provided by Plaintiffs and other Class Members to Defendant is protected by California law under the Confidentiality of Medical Information Act (CMIA). Cal. Civ. Code §§ 56, *et seq.*

74. Pursuant to Cal. Civ. Code § 56.05(i), "medical information," for the purposes of the CMIA is defined as "any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care, health care service plan, pharmaceutical company, or contractor regarding a patient's medical history, mental health application information, mental or physical condition, or treatment." Section 56.06(i) further provides: "'Individually identifiable' means that the medical information includes or contains any element of personal identifying information sufficient to allow identification of the individual, such as the patient's name, address, electronic mail address, telephone number, or social security number, or other information that, alone or in combination with other publicly available information, reveals the identity of the individual."

75. Information such as the Medical Information provided by Plaintiffs and other Class Members to Defendant is also protected by the HIPAA Privacy Rule.

76. The Health Insurance Portability and Accountability Act's Privacy Rule (HIPAA), 45 C.F.R. 160.103 *et seq.*, protects patient health information. HIPAA sets national standards for safeguarding "protected health information." For example, HIPAA limits the permissible uses of protected health information and prohibits disclosure of this information without explicit authorization. *See* 45 C.F.R. § 164.502. HIPAA also requires that covered entities, such as Defendant, implement appropriate safeguards to protect this information. *See* 45 C.F.R. § 164.530(c)(1).

77. Thus, state and federal laws reinforce the social norms and general expectation that individually-identifiable health information is to be kept private and confidential.

78. Accordingly, Plaintiffs and Class Members had a reasonable expectation of privacy regarding their Medical Information.

79. Privacy polls and studies also uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares that individual's data.

80.     For example, a recent study by *Consumer Reports* shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[17] Moreover, according to a study by *Pew Research Center*, a majority of Americans, approximately 79%, are concerned about how data is collected about them by companies.[18]

81.     And privacy law experts have expressed concerns about the disclosure to third parties of a users' sensitive medical information, in particular. For example, Dena Mendelsohn – the former Senior Policy Counsel at Consumer Reports and current Director of Health Policy and Data Governance at Elektra Labs – explained that having one's personal health information disseminated in ways one is unaware of could have serious repercussions, including affecting one's ability to obtain life insurance and how much one pay for that coverage, increasing the rate one is charged on loans, and leaving one vulnerable to workplace discrimination.[19]

***The Medical Information that Defendant Disclosed to Meta is Plaintiffs' and Class Members' Property, Has Economic Value, and its Unauthorized Disclosure Caused Economic Harm***

82.     It is common knowledge that there is an economic market for consumers' personal data – including the Medical Information that was disclosed by Defendant to Meta.

83.     In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender, and location" information are sold for about "$0.50 per 1,000 people."[20] This estimate was based upon "industry pricing data viewed by the Financial Times," at the time.[21]

---

[17] Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumerreports/ consumers-less-confident-about-healthcare-data-privacy-and-car-safety/.

[18] Americans and Privacy: Concerned, Confused, and Feeling Lack of Control Over Their Personal Information, PEW RESEARCH CENTER, (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confusedand-feeling-lack-of-control-over-their-personal-information/.

[19] Donna Rosato, *What Your Period Tracker App Knows About You*, CONSUMER REPORTS (Jan. 28, 2020), https://www.consumerreports.org/health-privacy/what-your-period-tracker-app-knows-about-you/.

[20] Emily Steel, et al., *How much is your personal data worth?*, FIN. TIMES (June 12, 2013), https://ig.ft.com/how-much-is-your-personal-data-worth/#axzz3myQiwm6u.

[21] *Id.*

84.     In 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30 per name."[22] That same report noted that "Data has become a stratefic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data (within the corporate acquisition context) can vary from $15 to more than $40 per user.[23]

85.     In 2021, a report from *Invisibly* found that personal medical information is one of the *most valuable pieces of data* within the data-market. "It's worth acknowledging that because health care records often feature a more complete collection of the patient's identity, background, and personal identifying information (PII), health care records have proven to be of particular value for data thieves. While a single social security number might go for $0.53, a complete health care records sells for $250 on average. For criminals, the more complete a dataset, the more potential value they can get out of it. As a result, health care breaches increased by 55% in 2020."[24]

86.     Moreover, health information has value to consumers. According to the annual Financial Trust Index Survey, conducted by the University of Chicago's Booth School of Business and Northwestern University's Kellogg School of Management, which interviewed more than 1,000 Americans, 93 percent would not share their health data with a digital platform for free. Half of the survey respondents would only share their data for $100,000 or more, and 22 percent would only share their data if they received between $1,000 and $100,000.[25]

87.     Given the existence of a market for the Medical Information disclosed by Defendant, Defendant has deprived Plaintiffs and Class Members of the economic value of their Medical Information by disclosing such data without authorization and without providing proper consideration for Plaintiffs' and other Class Members' property.

## TOLLING, CONCEALMENT, AND ESTOPPEL

---

[22] Pauline Glickman and Nicholas Glady, *What's the Value of Your Data?*, TECHCRUNCH (Oct. 13, 2015), https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/.
[23] *Id.*
[24] *How Much is Your Data Worth? The Complete Breakdown for 2021*, INVISIBLY.COM (July 13, 2021), https://www.invisibly.com/learn-blog/how-much-is-data-worth/.
[25] Andrea Park, *How much should health data cost? $100K or more, according to patients*, Becker's Hosp. Rev. (Feb. 12, 2020), https://www.beckershospitalreview.com/healthcare-information-technology/how-much-should-health-data-cost-100k-or-more-according-to-patients.html.

88.     Any applicable statutes of limitation have been tolled by Defendant's knowing and active concealment of its incorporation of the Meta Pixel into its website.

89.     The Meta Pixel and other tracking tools on Defendant's website were and are entirely invisible to a website visitor.

90.     Through no fault or lack of diligence, Plaintiffs and Class Members were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

91.     Plaintiffs were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their part.

92.     Defendant had exclusive knowledge that its website incorporated the Meta Pixel and other tracking tools and yet failed to disclose to customers, including Plaintiffs and Class Members, that by booking vaccination appointments through Defendant's website Plaintiffs' and Class Members' Medical Information would be disclosed or released to Meta.

93.     Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its customers' Medical Information. In fact, to the present Defendant has not conceded, acknowledged, or otherwise indicated to its customers that it has disclosed or released their Medical Information to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

94.     Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

95.     The earliest that Plaintiffs or Class Members, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of this Complaint.

## **ALLEGATIONS SPECIFIC TO PLAINTIFFS**

96.     In or about April 2021, Plaintiff Jane Doe I visited Rite Aid's website, while in California, and made an appointment for a vaccination.

97.     In or about March 2021, Plaintiff Jane Doe II visited Rite Aid's website, while in California, and made an appointment for a vaccination.

98.     In or about April 2022, Plaintiff Jane Doe III visited Rite Aid's website, while in California, and made an appointment for a vaccination.

99.     On information and belief, Plaintiffs' Medical Information was disclosed to Meta.

100.    Plaintiffs would not have used Rite Aid's to make a vaccination appointment had they known that their Medical Information would be disclosed to unauthorized third parties.

101.    Plaintiff Jane Doe I, Plaintiff Jane Doe II, and Plaintiff Jane Doe III each believed that because they were on the website of a healthcare provider and pharmacy, their respective Medical Information would be protected and kept confidential.

102.    None of the Plaintiffs saw anything on Defendant's website that suggested to any of them that their respective Medical Information would be disclosed or released to an unauthorized third party.

103.    Plaintiff Jane Doe I, Plaintiff Jane Doe II, and Plaintiff Jane Doe III, respectively, did not authorize, consent to, or otherwise encourage or permit the release of their Medical Information to Meta or any other third party.

## CLASS ACTION ALLEGATIONS

104.    Plaintiffs bring this action, on behalf of themselves and all others similarly situated, as a class action pursuant to Code of Civil Procedure § 382. Plaintiffs seek to represent a Class (whose members are "Class Members") composed of and defined as:

"All natural persons residing in California who used Defendant's website to make a vaccination appointment and whose Medical Information was disclosed or transmitted to Meta or any other unauthorized third party."

105.    Plaintiffs reserve the right to revise or amend the above Class definition and to add subclasses based on facts learned in discovery.

106.    This action has been brought and may be properly maintained as a class action under the Code of Civil Procedure § 382 because there is a well-defined community of interest in the litigation, the proposed Class is easily ascertainable, and Plaintiffs are proper representatives of the Class.

107.    <u>Numerosity</u>. The potential members of the proposed Class, as defined, are more than one million, and so numerous that joinder of all members of the Class is impracticable.

108.    <u>Typicality</u>. Plaintiffs' claims are typical of the claims of the Class. Plaintiff Jane Doe I, Plaintiff Jane Doe II, and Plaintiff Jane Doe III all used Defendant's website to make a vaccination appointment and, on information and belief, their Medical Information was disclosed or transmitted to Meta or another unauthorized third party.

109.    <u>Commonality</u>. Common questions of fact and law exist as to all members of the Class and predominate over the questions affecting only individual members of the Class. These common questions include but are not limited to:

a.      Whether Defendant's acts and practices violated Plaintiffs' and Class Members' privacy rights;

b.      Whether Defendant's acts and practices violated California's Constitution, Art. 1, § 1;

c.      Whether Plaintiffs and Class Members had a reasonable expectation that their Medical Information would not be disclosed to third parties without authorization;

d.      Whether Defendant's acts and practices violated the California Confidentiality of Medical Information Act, Civil Code §§ 56 *et seq.*;

e.      Whether the Medical Information disclosed by Defendant constitutes "medical information" within the meaning of Civil Code § 56.05(i);;

f.      Whether Defendant obtained written consent to or permission for its conduct;

g.      Whether Defendant's acts and practices violated the California Invasion of Privacy Act, Penal Code §§ 630, *et seq.*;

h.      Whether Defendant obtained express consent to or authorization for its conduct;

i.      Whether Defendant's acts and practices violated Business and Professions Code §§ 17200, *et seq.*;

j.      Whether Defendant's acts and practices harmed Plaintiffs and Class Members;

k.      Whether Plaintiffs and other Class Members are entitled to equitable relief, including but not limited to, restitution and disgorgement;

l.      Whether Plaintiffs and other Class Members are entitled to injunctive relief;

m.      Whether Plaintiffs and other Class Members are entitled to damages and other monetary relief; and

n.      Whether Plaintiffs and Class Members are entitled to reasonable attorneys' fees and costs.

110.     <u>Adequacy of Representation</u>. Plaintiffs are members of the Class and will fairly and adequately represent and protect the interests of the Class. Plaintiffs' interests do not conflict with those of Class Members, they have no conflict of interest with other Class Members, are not subject to any unique defenses, and have retained competent and experienced counsel.

111.     <u>Superiority of Class Action</u>. Class action treatment is superior to any alternative to ensure the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single form simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail. If this action is not certified as a class action, it will be impossible as a practical matter for many or most Class Members to bring individual actions to recover money from Defendant, due to the relatively small amounts of such individual recoveries relative to the costs and burdens of litigation. Moreover, individual Class Members do not have a significant interest in controlling the prosecution of separate

actions. Plaintiffs anticipate no difficulty in the management of this action which would preclude its maintenance as a class action.

112.    Plaintiffs reserve the right to add representatives for the Class, provided Defendant is afforded an opportunity to conduct discovery as to those representatives.

## FIRST CAUSE OF ACTION

### Common Law Invasion of Privacy – Intrusion into Private Matters

113.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

114.    Rite Aid's secret disclosure of Plaintiffs' and other Class Members' Medical Information, including each Class Member's first name, last name, other individually identifying information, information about their vaccine history, and information about their medical history, mental and physical condition, and treatment, constitutes an intentional intrusion upon Plaintiffs' and Class Members' private matters that were intended to stay private from third parties.

115.    Plaintiffs and Class Members had a reasonable expectation of privacy in their Medical Information. Plaintiffs and Class Members did not consent to, authorize, or have any reason to know about Rite Aid's intrusion into their privacy at the time it occurred.

116.    Defendant's intrusion into Plaintiffs' and Class Members' private affairs, seclusion, and solitude, would be highly offensive to a reasonable person.

117.    Plaintiffs and Class Members expected that the Medical Information they shared with a provider of healthcare would not be disclosed to an unauthorized third party. Social norms and industry standards inform the understanding that Medical Information is highly protected and that disclosure of that information to third parties requires consent and authorization. The secret disclosure of Medical Information would be highly offensive to a reasonable person.

118.    Plaintiffs and Class Members have been harmed as a result of Defendant's actions, including by, but not limited to, an invasion of their privacy rights.

119.    Plaintiffs and Class Members seek appropriate relief for their injuries, including, but not limited to, monetary damages to compensate for the harm to their privacy interests and disgorgement of profits made by Rite Aid as a result of its intrusions into Plaintiffs' and Class Members' private matters.

120.    Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions which were directed at invading Plaintiffs' and Class Members' privacy rights in conscious disregard of those rights. Such damages are necessary to deter Rite Aid from engaging in such conduct in the future.

121.    This action, if successful, will enforce an important right affecting the public interest and would confer a significant benefit on a large class of persons and/or the general public. Private enforcement is necessary and places a disproportionate financial burden on Plaintiffs in relation to Plaintiffs' stakes in the matter. Because this case is brought for the purposes of enforcing important rights affecting the public interest, Plaintiffs also seek the recovery of attorneys' fees and costs in prosecuting this action against Defendant under Code of Civil Procedure § 1021.5 and other applicable law.

122.    Plaintiffs, on behalf of themselves and the Class, request relief as further described below.

## SECOND CAUSE OF ACTION

### Invasion of Privacy and Violation of California Constitution, Art. 1, § 1

123.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

124.    The right to privacy is enshrined in the California Constitution. Article 1, Section 1, provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

125.    Plaintiffs and Class Members did not consent to or authorize Rite Aid to disclose their Medical Information to unauthorized third parties. Indeed, Plaintiffs and Class Members had no knowledge that such information was being so disclosed and, consequently, had no opportunity to deny consent or authorization.

126.    Plaintiffs and Class Members had a reasonable expectation of privacy in their personal information, identities, and Medical Information pursuant to Article 1, Section 1, of the California Constitution, social norms, and the expectations of privacy that attach to relationships and communications with providers of healthcare.

127.    Rite Aid's disclosure of Plaintiffs' and Class Members' Medical Information constitutes an intentional invasion of private communications, information, and matters, and an egregious breach of social norms.

128.    Rite Aid's conduct would be highly offensive to a reasonable person because the data disclosed was highly sensitive and personal, as protected by the California Constitution, and Rite Aid lacked consent or authorization to disclose such information.

129.    Rite Aid's violation of the privacy rights of thousands of Class Members, including Plaintiffs, without authorization or consent, constitutes an egregious breach of social norms.

130. Plaintiffs and Class Members have sustained damages and will continue to suffer damages as a result of Defendant's invasion of their privacy.

131. Plaintiff and Class Members seek appropriate relief for their injuries, including, but not limited to, monetary damages to compensate for the harm to their privacy interests and disgorgement of profits made by Rite Aid as a result of its intrusions into Plaintiffs' and Class Members' private matters.

132. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions which were directed at invading Plaintiffs' and Class Members' privacy rights in conscious disregard of those rights. Such damages are necessary to deter Rite Aid from engaging in such conduct in the future.

133. This action, if successful, will enforce an important right affecting the public interest and would confer a significant benefit on a large class of persons and/or the general public. Private enforcement is necessary and places a disproportionate financial burden on Plaintiffs in relation to Plaintiffs' stakes in the matter. Because this case is brought for the purposes of enforcing important rights affecting the public interest, Plaintiffs also seek the recovery of attorneys' fees and costs in prosecuting this action against Defendant under Code of Civil Procedure § 1021.5 and other applicable law.

134. Plaintiffs, on behalf of themselves and the Class, seek relief as further described below.

### THIRD CAUSE OF ACTION

**Violation of California Confidentiality of Medical Information Act, Cal. Civ. Code § 56.101**

135. Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

136. Cal. Civ. Code § 56.101(a) requires that every provider of health care "who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein."

137. Section 56.101(a) further provides, in pertinent part: "Any health care provider who "negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to remedies and penalties provided under subdivisions (b) and (c) of Section 56.36."

138. Rite Aid is, and all relevant times has been, a "provider of health care" within the meaning of §§ 56.101(a) and 56.05(m).

139. Plaintiffs and Class Members are "patients" as defined by Cal. Civ. Code § 56.05(j).

140. Rite Aid is a provider of health care who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information, within the meaning of §§ 56.101(a) and 56.05(i).

141.   Rite Aid failed to maintain, preserve, and store Plaintiffs' and Class Members' medical information in a manner that preserves the confidentiality of the information contained therein because Rite Aid disclosed to Meta Plaintiffs' and Class Members' Medical Information, as defined and described in this Complaint, including their first names, last names, and information about their medical histories, physical conditions, mental conditions, and treatments.

142.   Rite Aid's failure to maintain, preserve, and store medical information in a manner that preserves the confidentiality of the information was, at a minimum, negligent, and violates Civil Code § 56.101(a).

143.   Accordingly, pursuant to Cal. Civil Code § 56.36, Plaintiffs and Class Members are entitled to: (1) nominal damages of one thousand dollars ($1,000); (2) actual damages, in an amount to be determined at trial; and (3) statutory damages pursuant to Civil Code § 56.36(c); and (4) reasonable attorneys' fees and the costs of litigation.

144.   Plaintiffs, on behalf of themselves and the Class, seeks relief as further described below.

## FOURTH CAUSE OF ACTION

**Violation of California Confidentiality of Medical Information Act, Cal. Civ. Code § 56.10.**

145.   Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

146.   Cal. Civil Code § 56.10(a) prohibits a health care provider, such as Rite Aid, from disclosing medical information without first obtaining an authorization, unless a statutory exception applies.

147.   Rite Aid disclosed medical information without first obtaining authorization when it disclosed to Meta Plaintiffs' and Class Members' Medical Information, as defined and described in this Complaint, including their first names, last names, and information about their medical histories, physical conditions, mental conditions, and treatments. No statutory exception applies. As a result, Defendant violated Civil Code § 56.10(a).

148.   Rite Aid knowingly and willfully disclosed Plaintiffs' and Class Members' medical information without consent to Meta for financial gain. Namely, to market and advertise its services, or to allow others to market and advertise their services, in violation of Civil Code § 56.10(a).

149.   At the least, Rite Aid negligently disclosed Plaintiffs' and Class Members' medical information in violation of Civil Code § 56.10(a).

150.   Accordingly, pursuant to Cal. Civil Code § 56.35 and 56.36, Plaintiffs and Class Members are entitled to: (1) nominal damages of one thousand dollars ($1,000); (2) actual damages, in an amount

to be determined at trial; (3) statutory damages pursuant to Civil Code § 56.36(c); (4) punitive damages of three thousand dollars ($3,000) pursuant to § 56.35; and (5) reasonable attorneys' fees and the costs of litigation.

151.    Plaintiffs, on behalf of themselves and the Class, seek relief as further described below.

## FIFTH CAUSE OF ACTION

### Violation of California Invasion of Privacy Act (CIPA), California Penal Code §§ 630, *et seq*.

152.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

153.    The California Invasion of Privacy Act begins with its statement of purpose: "The legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society. The Legislature by this chapter intends to protect the right of privacy of the people of this state." Cal. Penal Code § 630.

154.    Cal. Penal Code § 631(a) provides, in pertinent part: "Any person who, by means of any machine, instrument, or contrivance, or in any other manner, intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500) . . ."

155.    Defendant is a "person" within the meaning of Cal. Penal Code § 631.

156.    The Meta Pixel and Plaintiffs' and Class Members' browsers, and Plaintiffs' and Class Members' computing and mobile devices qualify as a "machine, instrument, contrivance or . . . other manner" under this statute.

157.   Plaintiffs' and Class Members' communications of Medical Information with Defendant on and through Defendant's website were intended to be confined to the parties. Plaintiffs and Class Members were using what they understood to be Defendant's secure appointment scheduling tool and secure website and no indication was given that their Medical Information would be shared with or viewed by any unauthorized third party. The circumstances reasonably indicate that Plaintiffs and Class Members desired their communications with Defendant to be confined to the parties thereto.

158.   Despite not having any authorization from Plaintiffs or Class Members, Defendant aided, agreed with, or conspired with Meta, to permit Meta to intercept these communications and to learn the content of those communications while in transit or in the process of being sent or received.

159.   Defendant's conduct, as described above, violated Penal Code § 631. Under Penal Code § 637.2, Plaintiffs and Class Members are entitled to recover the greater of: (1) five thousand dollars ($5,000) per violation; or (2) three times the amount of actual damages according to proof at trial, as well as injunctive or other equitable relief.

160.   Plaintiffs and Class Members have also suffered irreparable injury from these unauthorized acts of disclosure. Their personal, private, and sensitive Medical Information has been collected, viewed, accessed, stored, and used by Meta, and has not been destroyed. Due to the continuing threat of such injury, Plaintiffs and Class Members have no adequate remedy at law and are entitled to injunctive relief. Plaintiffs and Class Members seek a permanent injunction under Penal Code § 637.2 enjoining Defendant from engaging in further conduct in violation of Cal. Penal Code § 630, *et seq.*

161.   Plaintiffs, on behalf of themselves and the Class, seek relief as further described below.

### SIXTH CAUSE OF ACTION

#### Breach of Contract

162.   Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

163.   In its Notice of Privacy Practices, as described above, Defendant set out specific limited purposes for which it would use or disclose Plaintiffs' and Class Members' Medical Information.

164.   Defendant's disclosure of Plaintiffs' and Class Members' Medical Information to Meta does not fall within any required or permissible uses or disclosures that Defendant set out in its Notice of Privacy Practices.

165.   Moreover, Defendant specifically promised: "We will obtain your written Authorization before using or disclosing protected health information about you for marketing purposes, to sell your

protected health information, or for purposes other than those listed above or otherwise permitted or required by law."

166.    Plaintiffs and other Class Members did not provide any written authorization for Defendant to disclose their Medical Information to Meta or to use their Medical Information for Defendant's own marketing purposes.

167.    Plaintiffs and other Class Members accepted Defendant's promises to protect their Medical Information in accordance with Defendant's Notice of Privacy Practices, and not to disclose their Medical Information to third parties without express consent or authorization, when they used Defendant's website to make vaccination appointments.

168.    Plaintiffs and Class Members fully performed their obligations under their contracts with Defendant, including entering their Medical Information into Defendant's website and using Defendant's website to make vaccination appointments.

169.    Defendant did not perform consistent with its obligations under the contract. Defendant secretly disclosed Plaintiffs' and Class Members' Medical Information to Meta in violation of Defendant's agreement with Plaintiffs and Class Members.

170.    As a direct and proximate result of Defendant's breaches of its contracts, Plaintiffs and Class Members sustained damages as alleged herein. Plaintiffs and Class Members would not have used Defendant's website to make a vaccination appointment or would not have entered their medical information into Defendant's website had they known their Medical Information would be disclosed.

171.    Plaintiff and Class Members are entitled to compensatory and consequential damages as a result of Defendant's breach of contract.

172.    Plaintiffs, on behalf of themselves and the Class, seek relief as further described below.

## SEVENTH CAUSE OF ACTION

### Breach of Implied Contract (in the alternative)

173.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

174.    When Plaintiffs and Class Members used Defendant's website to make a vaccination appointment and entered their Medical Information in order to make that appointment, they entered implied contracts pursuant to which Defendant agreed to safeguard and not disclose their Medical Information without authorization or consent.

175.    Plaintiffs and Class Members accepted Defendant's offers and provided their Medical Information to Defendant.

176.    Plaintiffs and Class members would not have entrusted Defendant with their Medical Information in the absence of an implied contract between them and Defendant obligating Defendant not to disclose this information without consent.

177.    Defendant breached these implied contracts by disclosing Plaintiffs' and Class Members' Medical Information to Meta.

178.    As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiffs and Class Members sustained damages as alleged herein. Plaintiffs and Class Members would not have used Defendant's website to make a vaccination appointment or would not have entered their medical information into Defendant's website had they known their Medical Information would be disclosed.

179.    Plaintiffs and Class Members are entitled to compensatory and consequential damages as a result of Defendant's breach of implied contract.

180.    Plaintiffs, on behalf of themselves and the Class, seek relief as further described below.

## EIGHTH CAUSE OF ACTION

### Violation of California Business & Professions Code §§ 17200 *et seq*. (UCL)

181.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

182.    The UCL prohibits unfair competition in the form of any unlawful, unfair, or fraudulent business act or practice. Cal. Bus. & Prof. Code § 17204 allows "any person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL. Such a person may bring such an action on behalf of themselves and others similarly situated, who are affected by the unlawful, unfair, or fraudulent business practice or practices.

183.    Rite Aid's acts, omissions, practices, and non-disclosures as alleged herein constituted unlawful, unfair, and fraudulent business acts and practices within the meaning of Cal. Bus. & Prof. Code §§ 17200, *et seq*. (UCL).

184.    Defendant engaged in "unlawful" business acts and practices, as set forth above: in violation of the common law; in violation of the California Constitution; and in violation of California statutes, including the Confidentiality of Medical Information Act and the California Invasion of Privacy Act.

185.    Plaintiffs reserve the right to allege other violations of law committed by Defendant that constitute unlawful business acts or practices within the meaning of the UCL.

186.    Defendant has also engaged in "unfair" business acts and practices. California has a strong public policy of protecting consumers' privacy interests, including consumers' personal data. Rite Aid violated this strong public policy by, among other things, surreptitiously disclosing, releasing, and otherwise misusing Plaintiffs' and Class Members' Medical Information without Plaintiffs' and Class Members' consent. Rite Aid's acts and practices violate the policies underlying the statutes and the article of the California Constitution referenced herein.

187.    Defendant's acts and practices are also "unfair" in that they are immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers. Defendant secretly disclosed, released, and otherwise misused Plaintiffs' and Class Members' Medical Information, with no corresponding benefit to its affected customers. And, because consumers were unaware of Defendant's incorporation of tracking tools into its website and that Defendant would disclose and release their Medical Information to unauthorized third parties, they could not have avoided the harm.

188.    Had Plaintiffs and Class Members known that their Medical Information would be disclosed or released by Defendant to unauthorized third parties, they would not have shared their Medical Information with Defendant's website or would not have used Defendant's website.

189.    The UCL also prohibits any "fraudulent business act or practice." Defendant's above-described nondisclosures and misleading statements were false, misleading, and likely to deceive the consuming public in violation of the UCL.

190.    Plaintiffs and Class Members suffered injury in fact and lost money or property as a result of Defendant's acts and practices in that a portion of any money Plaintiffs and Class Members paid for Defendant's services, including giving vaccinations, went to fulfill Defendant's obligations with respect to the confidentiality and security of Plaintiffs' and Class Members' Medical Information, and Defendant failed to fulfill those obligations.

191.    Plaintiffs and Class Members also suffered injury in fact as a result of Defendant's acts and practices because they paid more for Defendant's services than they otherwise would have had they known Defendant was disclosing their Medical Information to unauthorized third parties in violation of its legal obligations, social norms, and reasonable consumer expectations.

192.    Plaintiffs and Class Members have also suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) invasion of privacy; (ii) breach of the confidentiality of their Medical Information; and/or (iii) deprivation of the value of their Medical Information for which there is a well-established national and international market.

193.   Plaintiffs seek a declaration from the Court that Defendant's conduct alleged herein constitutes a violation of Bus. & Prof. Code §§ 17200 *et seq.* under the unlawful, unfair, and fraudulent prongs of the UCL.

194.   Absent injunctive relief from the Court, Defendant is unlikely to fully correct its illegal conduct. Defendant has not acknowledged its wrongful disclosure and release of Plaintiffs' and Class Members' Medical Information, it has not announced any changes to is practices regarding its treatment of Plaintiffs' and Class Members' Medical Information, and, on information and belief, it has not removed the offending tracking tools from its website. Plaintiffs seek an order from this Court for themselves, the Class Members, and the general public, requiring Defendant to correct its illegal conduct and requiring Defendant to issue a comprehensive notice to affected consumers.

195.   Plaintiffs also seek restitution on behalf of themselves and the Class.

196.   This action, if successful, will enforce an important right affecting the public interest and would confer a significant benefit on a large class of persons and/or the general public. Private enforcement is necessary and places a disproportionate financial burden on Plaintiffs in relation to Plaintiffs' stakes in the matter. Because this case is brought for the purposes of enforcing important rights affecting the public interest, Plaintiffs also seek the recovery of attorneys' fees and costs in prosecuting this action against Defendant under Code of Civil Procedure § 1021.5 and other applicable law.

197.   Plaintiffs, on behalf of themselves and the Class, seek relief as further described below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and other Class Members, pray for judgment against Defendant as follows:

198.   Ordering that this action may proceed and be maintained as a class action under § 382 of the Code of Civil Procedure; and defining the Class as specified above and appointing Plaintiffs as Representatives of the Class and their attorneys as Counsel for the Class;

199.   Awarding Plaintiffs and Class Members compensatory damages, disgorgement of profits, and punitive damages for Defendant's invasion of privacy and violation of Article 1, Section 1 of the California Constitution;

200.   Awarding Plaintiffs and Class Members nominal damages of $1,000 per violation, or actual damages, and reasonable attorneys' fees and the costs of litigation, for Defendant's violations of California's Confidentiality of Medical Information Act, Cal. Civil Code § 56.101;

201.   Awarding Plaintiffs and Class Members nominal damages of $1,000 per violation, or actual damages, punitive damages of $3,000 per violation, and reasonable attorneys' fees and the costs of

litigation, for Defendant's violations of California's Confidentiality of Medical Information Act, Cal. Civil Code § 56.10;

202.    Awarding Plaintiffs and Class Members statutory damages of $5,000 per violation, or three times the amount of actual damages, and injunctive relief for Defendant's violations of California's Invasion of Privacy Act, Penal Code §§ 630 *et seq.*;

203.    Awarding compensatory and consequential damages for Defendant's breach of contract or, in the alternative, Defendant's breach of implied contract;

204.    Declaring that Defendant's conduct alleged herein constitutes a violation of Bus. & Prof. Code §§ 17200 *et seq.* under the unlawful, unfair, and fraudulent prongs of the UCL;

205.    Awarding Plaintiffs and Class Members restitution and injunctive relief for Defendant's violations of the UCL, Cal. Bus. & Prof. Code §§ 17200 *et seq.*;

206.    Awarding attorneys' fees and costs as authorized by statute and governing law, including Code of Civil Procedure § 1021.5; and

207.    Awarding such other and further relief, at law and in equity, as the nature of this case may require or as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of themselves and other members of the Class hereby demand a jury trial on all issues so triable.

DATED:   February 13, 2023                    Respectfully submitted,


/s/ Julian Hammond
Julian Hammond
*Attorneys for Plaintiffs and the Putative Classes*

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)* | FOR COURT USE ONLY |
|---|---|
| **JULIAN HAMMOND | SBN:  268489**<br>**HAMMONDLAW, P.C.**<br>**1201 PACIFIC AVE #600   TACOMA, WA 98402**<br>TELEPHONE NO.: (310) 601-6766 | FAX NO. (310) 295-2385 | E-MAIL ADDRESS:<br>ATTORNEY FOR :  Plaintiff: | **ELECTRONICALLY FILED**<br>Superior Court of California<br>County of Alameda<br>03/01/2023<br>*Chad Finke, Executive Officer / Clerk of the Court*<br>By: _____ Deputy<br>V. Hutton |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA

STREET ADDRESS: 1225 FALLON STREET

MAILING ADDRESS:

CITY AND ZIP CODE: OAKLAND, CA 94612

BRANCH NAME:

| | CASE NUMBER: |
|---|---|
| PLAINTIFF:  JANE DOE I | 23CV027782 |
| DEFENDANT:  RITE AID CORPORATON, A DELAWARE CORPORATION | |
| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.: |

1. At the time of service I was at least 18 years of age and not a party to this action.
2. I served copies of:
   a. ☑ Summons
   b. ☑ Complaint
   c. ☐ Alternative Dispute Resolution (ADR) package
   d. ☐ Civil Case Cover Sheet  *(served in complex cases only)*
   e. ☐ Cross-complaint
   f. ☑ other:  **Notice of Complex Determination Hearing; Civil Case Cover Sheet; Notice of Case Management Conference**
3. a.  Party served *(specify name of party as shown on documents served):*
   **RITE AID CORPORATON, A DELAWARE CORPORATION**
   b. ☑ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*
   **DAISY MONTENEGRO, INTAKE SPECIALIST, CT CORPORATION SYSTEM - AGENT FOR SERVICE OF PROCESS**
4. Address where the party was served:  **CT CORPORATON SYSTEM**
   **330 N. BRAND BLVD., #700**
   **GLENDALE, CA 91203**
5. I served the party *(check proper box)*
   a. ☑ **by personal service.**  I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date):* **2/27/2023**   (2) at *(time):* **12:48 PM**
   b. ☐ **by substituted service.**  On *(date):* at *(time):* I left the documents listed in item 2 with or
   **in the presence of** *(name and title or relationship to person indicated in item 3b):*
      (1) ☐ **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served.  I informed him of her of the general nature of the papers.
      (2) ☐ **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party.  I informed him or her of the general nature of the papers.
      (3) ☐ **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box.  I informed him of her of the general nature of the papers.
      (4) ☐ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., §415.20). I mailed the documents on
   *(date):* from *(city):*   **or** ☐ a declaration of mailing is attached.
      (5) ☐ I attach a  **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

PETITIONER: **JANE DOE**

RESPONDENT: **RITE AID CORPORATON, A DELAWARE CORPORATION**

23CV027782

c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

    (1) on *(date):*           (2) from *(city):*

    (3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgement of Receipt.) (Code Civ. Proc., § 415.30.)

    (4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. ☐ **by other means** *(specify means of service and authorizing code section):*

    ☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

a. ☐ as an individual defendant.

b. ☐ as the person sued under the fictitious name of *(specify):*

c. ☐ as occupant.

d. ☑ On behalf of *(specify):* **RITE AID CORPORATON, A DELAWARE CORPORATION**
    under the following Code of Civil Procedure section:

    ☑ 416.10 (corporation)               ☐ 415.95 (business organization, form unknown)
    ☐ 416.20 (defunct corporation)         ☐ 416.60 (minor)
    ☐ 416.30 (joint stock company/association)    ☐ 416.70 (ward or conservatee)
    ☐ 416.40 (association or partnership)      ☐ 416.90 (authorized person)
    ☐ 416.50 (public entity)               ☐ 415.46 (occupant)
                                      ☐ other:

7. **Person who served papers**

a. Name: **MARK MANCHESTER, C.C.P.S. - REZAC-MEYER ATTORNEY SERVICE**

b. Address: **1451 WILSHIRE BLVD., SUITE 550  LOS ANGELES, CA 90017**

c. Telephone number: **(213) 481-1770**

d. **The fee** for service was: **$ 86.65**

e. I am:

    (1) ☐ not a registered California process server.

    (2) ☐ exempt from registration under Business and Professions Code section 22350(b).

    (3) ☑ registered California process server:

        (i) ☐ owner ☐ employee    ☐ independent contractor.

        (ii) Registration No.: **2014253874**

        (iii) County: **LOS ANGELES**

8. ☑ **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

    or

9. ☐ **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

    Date: **2/28/2023**

**MARK MANCHESTER, C.C.P.S.**
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)

▶                              (SIGNATURE)

1  JULIAN HAMMOND (SBN 268489)
   jhammond@hammondlawpc.com
2  ADRIAN BARNES (SBN 253131)
   abarnes@hammondlawpc.com
3  ARI CHERNIAK (SBN 290071)
   acherniak@hammondlawpc.com
4  POLINA BRANDLER (SBN 269086)
   pbrandler@hammondlawpc.com
5  HAMMONDLAW, P.C.
   1201 Pacific Ave, 6th Floor
6  Tacoma, WA 98402
   (310) 601-6766
7  (310) 295-2385 (Fax)
8  *Attorneys for Plaintiffs and the Putative Classes*

9

**SUPERIOR COURT FOR THE STATE OF CALIFORNIA**

10

**COUNTY OF ALAMEDA**

11

12

| | |
|---|---|
| **JANE DOE I**, **JANE DOE II**, **JANE DOE III**, and **JANE DOE IV**, on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br><br>vs.<br><br><br>**RITE AID CORPORATION**, a Delaware Corporation,<br><br>          Defendant. | CASE NO. 23CV027782<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR:**<br><br>**(1) Invasion of Privacy—Intrusion into Private Matters;**<br>**(2) Invasion of Privacy and Violation of California Constitution, Art. 1, § 1;**<br>**(3) Violation of Confidentiality of Medical Information Act (CMIA), California Civil Code § 56.101;**<br>**(4) Violation of CMIA, California Civil Code § 56.10;**<br>**(5) Violation of the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 *et seq*.;**<br>**(6) Violation of California Invasion of Privacy Act (CIPA), Penal Code §§ 630, *et seq*.;**<br>**(7) Breach of Contract;**<br>**(8) Breach of Implied Contract (in the alternative); and**<br>**(9) Violation of Business & Professions Code §§ 17200 *et seq*. (UCL)**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Plaintiffs Jane Doe I, Jane Doe II, Jane Doe III, and Jane Doe IV ("Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their attorneys of record, HammondLaw, P.C., complain and allege the following, based upon personal knowledge, where applicable, information and belief, and the investigation of counsel:

## INTRODUCTION

1.     This is a privacy class action under California Code of Civil Procedure § 382 seeking damages (including but not limited to compensatory, statutory, and punitive damages), civil penalties, restitution, disgorgement of profits, declaratory relief, injunctive relief, and reasonable attorney's fees and costs pursuant to California Business & Professions Code § 17203, California Civil Code §§ 56.35, 56.36, California Penal Code § 637.2, 18 U.S.C. § 2520, and California Code of Civil Procedure § 1021.5 on behalf of the members of the classes, as defined below.

2.     During the Class Period, Defendant Rite Aid Corporation (hereinafter, "Rite Aid" or "Defendant") operated one of the largest chains of pharmacies in the United States, delivering health care services and retail products to over one million Americans daily.[1] As of February 26, 2022, Defendant operated 2,450 retail drugstores in seventeen states, with approximately one-third on the West Coast: 526 stores in California, 196 in Washington, and 71 in Oregon.[2] Defendant also maintained and operated, and continues to maintain and operate, a website – https://www.riteaid.com – through which its customers can, among other things, learn about Defendant's services, find Rite Aid stores, fill their prescriptions, book various medical tests, schedule a number of different vaccinations, and otherwise interact with Defendant.[3]

3.     In the most recent reported year, fiscal 2022 (52 weeks ending Feb. 26, 2022), one of the primary focuses of Rite Aid's marketing activities was "[d]riving the awareness of COVID-19 vaccination and testing, as well as flu and ancillary immunizations."[4] Rite Aid also reported "delivering 14 million [COVID-19] vaccine doses," and stated that "Pharmacy same store sales increased 7.9%" in fiscal 2022,

---

[1] Rite Aid Corporation, <u>Fiscal 2022 Annual Report</u>, Form 10-K, p. 5 (2022) (https://s27.q4cdn.com/633053956/files/doc_financials/2022/ar/d3b229ff-5147-4849-bfe1-13cec0816db9.pdf).

[2] *Id.* at p. 41.

[3] Rite Aid Home Page, https://www.riteaid.com (last visited, Feb. 7, 2023).

[4] Rite Aid Corporation, <u>Fiscal 2022 Annual Report</u>, Form 10-K, pp. 11-12 (2022) (https://s27.q4cdn.com/633053956/files/doc_financials/2022/ar/d3b229ff-5147-4849-bfe1-13cec0816db9.pdf).

and that this was due, in part, to Rite Aid's "COVID-19 vaccination program."[5] In that same year, the revenue achieved by Rite Aid's Retail Pharmacy Segment was $17.49 billion.[6]

4.    When Plaintiffs and other customers used Defendant's website in order to make a vaccination appointment, they were required to provide personal information, including their first name, last name, street address, city, state, zip code, sex assigned at birth, race, and whether they are of "Hispanic, Latino/Latina, or Spanish Origin."

5.    Plaintiffs and other customers were subsequently required to provide details of their medical history including answers to questions such as, for example: "Do you have a neurological disorder such as seizures or other disorders that affect the brain or have had a disorder that resulted from a vaccine (e.g. Guillain-Barre Syndrome)?" "Have you had a shingles vaccine?" "Have you had a whooping cough (Tdap/Td) vaccine?" "Do you have a long term health problem with lung disease or asthma?" "During the past year, have you received a transfusion of blood or blood products, including antibodies?" "Are you pregnant or could you become pregnant in the next three months?"

6.    Unbeknownst to Plaintiffs and other customers, the answers they gave to these questions, along with their personal information and personal identifiers, were secretly disclosed to Meta Platforms, Inc. (formerly known as Facebook) ("Meta" or "Facebook"), an unauthorized third party.

7.    Through the Meta Pixel, a tracking tool intentionally incorporated by Rite Aid in its website source code or otherwise affirmatively permitted on its website by Rite Aid, for customers who made a vaccination appointment, including Plaintiffs, Defendant disclosed individually identifying information and information regarding their medical history, mental and physical condition, and treatment (hereinafter "Medical Information"), to Meta, all without its customers' knowledge and/or consent.

8.    Thus, through its actions and practices, Rite Aid has disclosed and released Medical Information to Meta. This massive breach of confidentiality and privacy has, on information and belief, affected millions of Rite Aid's customers in the state of California and millions of Rite Aid's customers nationwide.

9.    Plaintiffs bring this class action on behalf of themselves and all natural persons residing in California who used Defendant's website to make a vaccination appointment and whose Medical Information was disclosed or transmitted to Meta or any other unauthorized third party (hereinafter, "California Class Members").

---

[5] *Id.* at pp. 7, 56.

[6] *Id.* at p. 55.

10.     Plaintiffs also bring this class action on behalf of themselves and all natural persons who used Defendant's website to make a vaccination appointment and whose Medical Information was disclosed or transmitted to Meta or any other unauthorized third party (hereinafter, "Nationwide Class Members," and, collectively with California Class Members, hereinafter "Class Members").

11.     Rite Aid's actions constitute an extreme invasion of Plaintiffs' and Class Members' privacy. Rite Aid's actions also violated common law, the California Constitution, and numerous federal and state statutes.

## **PARTIES**

12.     Plaintiff Jane Doe I, is a citizen of California, residing in Cerritos, Los Angeles County, California. Plaintiff Jane Doe I used Defendant's website to book a vaccination appointment in or about April 2021. As a result, her Medical Information was disclosed to Meta without her knowledge, consent, or authorization.

13.     Plaintiff Jane Doe II, is a citizen of California, residing in Van Nuys, Los Angeles County, California. Plaintiff Jane Doe II used Defendant's website to book a vaccination appointment in or about March 2021. As a result, her Medical Information was disclosed to Meta without her knowledge, consent, or authorization.

14.     Plaintiff Jane Doe III, is a citizen of California, residing in Brea, Orange County, California. Plaintiff Jane Doe III used Defendant's website to book a vaccination appointment in or about April 2022. As a result, her Medical Information was disclosed to Meta without her knowledge, consent, or authorization.

15.     Plaintiff Jane Doe IV, is a citizen of California, residing in Los Angeles, Los Angeles County, California. Plaintiff Jane Doe IV used Defendant's website to book a vaccination appointment in or about October 2022. As a result, her Medical Information was disclosed to Meta without her knowledge, consent, or authorization.

16.     Defendant Rite Aid Corporation, is a Delaware Corporation. Rite Aid's principal place of business, as listed with the California Secretary of State, is 30 Hunter Lane, Camp Hill, Pennsylvania 17011. On information and belief, Rite Aid has moved its corporate headquarters and principal place of business to 1200 Intrepid Avenue, 2nd Floor, Philadelphia, Pennsylvania 19112.

## **JURISDICTION**

17.     This Court has jurisdiction over Plaintiffs' and California Class Members' claims for compensatory damages, disgorgement of profits, and punitive damages arising from Defendant's invasion of privacy and violation of Article 1, Section 1 of the California Constitution.

18.     This Court has jurisdiction over Plaintiffs' and California Class Members' claims for nominal damages, actual damages, statutory damages, punitive damages, and reasonable attorneys' fees and costs arising from Defendant's violation of the California Confidentiality of Medical Information Act, Cal. Civil Code §§ 56 *et seq.*

19.     This Court has jurisdiction over Plaintiffs' and Nationwide Class Members' claims for equitable and declaratory relief, statutory damages of $10,000, or the sum of the actual damages and any profits made by Rite Aid as a result of its violations, and reasonable attorneys' fees and costs arising from Defendant's violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2510 *et seq.*

20.     This Court has jurisdiction over Plaintiffs' and California Class Members' claims for statutory damages of $5,000 per violation, or three times the amount of actual damages, arising from Defendant's violation of the California Invasion of Privacy Act, Penal Code §§ 630 *et seq.*

21.     This Court has jurisdiction over Plaintiffs' and Nationwide Class Members' claims for breach of contract and, in the alternative, breach of implied contract.

22.     This Court has jurisdiction over Plaintiffs' and California Class Members' claims for restitution and declaratory and injunctive relief arising from Defendant's unlawful, unfair, and fraudulent business practices under Cal. Bus. & Prof. Code §§ 17200 *et seq.*

23.     This Court has jurisdiction over Plaintiffs' and California Class Members' claims for reasonable attorneys' fees and costs pursuant to § 1021.5 of the California Code of Civil Procedure.

24.     This Court has personal jurisdiction over the parties because Defendant has continuously and systematically conducted business in the State of California. Likewise, Plaintiffs are California residents whose rights were violated in the State of California as a result of their contact with Defendant from and within California.

## VENUE

25.     Venue is proper in this Court pursuant to California Code of Civil Procedure § 395. Defendant is a foreign corporation and has not designated with the California Secretary of State a principal place of business in California. Thus, venue is proper in any county within California.

## FACTUAL BACKGROUND

### *In Order for Plaintiffs and Class Members to Make Vaccination Appointments on its Website, Defendant Required Them to Input Medical Information*

26.     Throughout the Class Period, Defendant maintained and operated websites (including www.riteaid.com), through which Defendant has encouraged and permitted consumers to make appointments for a variety of vaccinations, including vaccinations for: COVID-19; flu; shingles; Tdap

(Tetanus, Diphtheria, Pertussis); DTaP (Diphtheria, Tetanus, Pertussis); Hepatitis A & B; Hepatitis A; Hepatitis B; HPV; Meningitis; Measles, Mumps, & Rubella; and, Chicken Pox (Varicella).

27.     To begin the process of making a vaccination appointment, when a Class Member visited Defendant's website they could, from the home page, click on the "Schedule Vaccinations" button. Having clicked on that button, the Class Member would be taken to a page with the heading "Schedule an Appointment," and would be required to enter her ZIP code and the "Vaccine recipient's date of birth (MM/DD/YYYY)", and to select the type of immunization needed. Depending on the type of immunization selected, the Class Member would be asked whether he or she had received a dose of that immunization before, or, in the case of a COVID-19 vaccine, he or she would be asked for details of the particular type of vaccine required and information about previous COVID-19 vaccines he or she had received.

28.     Next, the Class Member would be presented with a list of Rite Aid Pharmacy locations and, under each location, one or more dates with available vaccination appointments. The Class Member would then click on one of those available dates at one location, and be presented with a number of available appointment times from which she could click on a time and then click another button to "Select Appointment."

29.     Having selected an appointment, the Class Member would then be required to fill in a form entitled "Recipient Information" in which the Class Member would provide the following information: first name; last name; street address; city; state; zip code; sex assigned at birth; race; whether they are Hispanic, Latino/Latina, or Spanish origin; and last 4 digits of Social Security Number or the fact that they do not have a Social Security Number.

30.     The next step would be for the Class Member to provide his or her own phone number and to select a language preference for communications including a confirmation of the appointment and reminders.

31.     Having provided his or her contact information, the Class Member would be taken to a page entitled "Vaccine history" and required to answer a number of questions about his or her medical history, physical condition, and treatment. These questions, which could be answered by selecting "Yes", "No", or "Don't Know," include: "Do you have allergies to medications, food (e.g. eggs), latex or any vaccine component (e.g. neomycin, formaldehyde, gentamicin, thimerosal, bovine protein, phenol, polymyxin, gelatin, baker's yeast or yeast)?" "Have you received a vaccine in the past 4 weeks?" "Have you ever had a serious reaction after receiving a vaccination?" "Do you have a neurological disorder such as seizures or other disorders that affect the brain or have had a disorder that resulted from a vaccine (e.g.

Guillain-Barre Syndrome)?" "Have you had a pneumococcal vaccine? (You may need two different pneumococcal shots.)" "Have you had a shingles vaccine?" "Have you had a whooping cough (Tdap/Td) vaccine?"

32.     After completing the "Vaccine history" form, the Class Member could click a button marked "Next" and proceed to a page entitled "Health information." On this page, the Class Member would be required to answer a number of questions about his or her medical history, physical condition, and treatment. These questions include: "Do you have any long-term health problems with heart disease, kidney disease, metabolic disorder (e.g. diabetes), anemia, or blood disorders?" "Do you have a long term health problem with lung disease or asthma?" "Do you have cancer, leukemia, AIDS, or any other immune system problem? (In some circumstances you may be referred to your physician.)" "Do you take prednisone, other steroids, or anticancer drugs, or have you had radiation treatments?" "During the past year, have you received a transfusion of blood or blood products, including antibodies?" "Do you use any nicotine products?." The Class Member would also be prompted to answer the option question of whether he or she had any other medical conditions, and to type a response.

33.     The next page, entitled "Caregiving & Pregnancy," required the Class Member to answer two required questions: "Are you a parent, family member, or caregiver to a newborn infant?" "Are you pregnant or could you become pregnant in the next three months?"

34.     The Class Member would, next, reach a page on which he or she could confirm the appointment. To confirm the appointment, the Class Member would have to enter an electronic signature. Above the electronic signature would be a number of statements and acknowledgements. As an example, for those Class Members making an appointment from California, the statements and acknowledgements included the following: "I, as the vaccine recipient or legal guardian/parent of a minor child vaccine recipient, authorize the release of any medical or other information with respect to this vaccine to specified healthcare providers, Medicare, Medicaid or other third party payer as needed and request payment of authorized benefits to be made on my or the vaccine recipient's behalf to Rite Aid."; "I acknowledge that the vaccination record may be shared with federal or state or city agencies for registry reporting."; "I acknowledge receipt of Rite Aid's Notice of Privacy Practices for Protected Health Information."; "I acknowledge that the administration of an immunization or vaccine does not substitute for an annual check-up with the vaccine recipient's primary care physician."; "For CA: I acknowledge that Rite Aid intends to share the vaccination record with the California Immunization Registry (CAIR) and that I have reviewed the 'CAIR Immunization Notice to Patients and Parents' attached to this form."; and, "For CA: I acknowledge that if I do not want the immunization information shared with other CAIR users, I must

complete and submit to CAIR a "Decline or Start Sharing/Information Request Form" obtained either from the pharmacy or downloaded from the CAIR website." The underlined terms in the above statements and acknowledgements were hyperlinks to Rite Aid's Notice of Privacy Practices and to the CAIR website, respectively.

35.     On information and belief, throughout the Class Period, the process for making a vaccination appointment on Defendant's website has been substantially the same in all material respects throughout the United States.

36.     Thus, in order to use Defendant's website to schedule a vaccination appointment, Plaintiffs and other Class Members were required by Defendant's website to enter confidential, private, and sensitive personal and health information into the website.

***Defendant's Notice of Privacy Practices Promised that Plaintiffs' and Class Members' Medical Information Would be Safeguarded and Not Disclosed to Unauthorized Third Parties***

37.     Defendant's Notice of Privacy Practices, posted on its website, and substantively identical in pertinent parts throughout the Class Period, describes, "in accordance with the Health Insurance Portability and Accountability Act of 1996 ('HIPAA') Privacy Rule, how Rite Aid may use and disclose [customers'] protected health information [PHI] to carry out treatment, payment or health care operations and for other specific purposes that are permitted or required by law."

38.     The Notice of Privacy Practices sets out certain limited uses of protected health information for the purposes of "Treatment, Payment and Health Care Operations." It states: "We will use your [PHI] to treat you," We will use your [PHI] to obtain payment for products and services," and "We will use your [PHI] to carry out health care operations." After each of these statements, the Notice of Privacy Practices provides additional detail about how a customer's PHI might be used for each respective purpose.

39.     The Notice of Privacy Practices then sets out "uses and disclosures that are either permitted or required by the HIPAA Privacy Rule." The Notice explains: "Using their professional judgment, our pharmacists may disclose your protected health information to a family member, other relative, close personal friend, or any person you identify as being involved in your health care. This could include allowing those persons to pick up filled prescriptions, medical supplies, or medical records on your behalf. We may enter into contracts with some entities known as Business Associates that perform services for us. For example, we sometimes engage Business Associates to sort insurance or other third party payor claims for submission to the actual payor. We may disclose protected health information to our Business Associates so that they can perform their services and then bill your third party payor for services

rendered. We require the Business Associates to appropriately safeguard the protected health information."

40.     Next, the Notice of Privacy Practices details "other required or permitted disclosures of [PHI]." The Notice contains an exhaustive list of these other potential disclosures, including, for example: "to law enforcement agencies as required by law or in response to a valid subpoena or other legal process," "to a coroner or medical examiner when necessary, for example, to identify a deceased person or to determine a cause of death, or to funeral directors consistent with applicable law to carry out their duties," "when necessary to prevent a serious threat to the patient's health and safety or the health and safety of the public or another person," and "to authorized federal officials so they may provide protection to the President, other authorized persons, or foreign heads of state or conduct special investigations."

41.     The Notice of Privacy Practices then provides: "We will obtain your written Authorization before using or disclosing protected health information about you for marketing purposes, to sell your protected health information, or for purposes other than those listed above or otherwise permitted or required by law. You may revoke an Authorization in writing at any time. Such revocations must be made in writing. Upon receipt of the written revocation, we will stop using or disclosing protected health information about you, except to the extent that we have already taken action in reliance on the Authorization." (emphasis added).

42.     Plaintiffs' and Class Members' Medical Information, as that term is defined in this Complaint, is "protected health information" within the meaning of HIPAA and, thus, Defendant's Notice of Privacy Practices.

***Defendant Secretly Disclosed, and Permitted Meta to Intercept, Plaintiffs' and Class Members' Medical Information***

43.     Completely unbeknownst to Plaintiffs and other Class Members, and continuing to the present, Medical Information that they communicated to Defendant through Defendant's website while making a vaccination appointment was intercepted by and/or disclosed to at least one unauthorized third party: Meta.

*Meta's Platform and the Meta Pixel*

44.     Meta operates the world's largest social media company.

45.     Meta maintains profiles on users that include users' real names, locations, email addresses, friends, likes, and communications that Meta associates with personal identifiers including IP addresses and cookie identifiers.

46.     Facebook users are allowed only one account and must share the name they go by in everyday life.

47.     Meta also tracks non-users across the web through its widespread Internet marketing products and source code.

48.     Meta's revenue is derived almost entirely from selling targeted advertising to Facebook users on Facebook.com and to all internet users on non-Facebook sites that integrate Meta marketing source code on their websites.

49.      Meta sells advertising space by highlighting its ability to target users. Meta can target users so effectively because it tracks Facebook's users' activity both on and off its site. This allows Meta to draw inferences about users beyond what they explicitly disclose on their Facebook accounts. Meta compiles this information into a generalized dataset called "Core Audiences," to which advertisers can apply specific filters and parameters in order to generate a target audience for their advertisements.

50.      Advertisers are also able to build "Custom Audiences." Advertisers can use "customer lists, website or app traffic, or engagement across Facebook technologies, to create Custom Audiences of people who already know [their] business."[7] Moreover, Advertisers are able to use their Custom Audience to create a Lookalike Audience. To create a Lookalike Audience, Facebook "leverages information such as demographics, interests and behaviors from [the advertiser's source Custom Audience] to find new people who share similar qualities." Using a Lookalike Audience allows an advertiser to deliver its advertisements to an "audience of people who are similar to (or 'look like') [its] existing customers."[8]

51.     One method by which an Advertiser can create a Custom Audience, and consequently a Lookalike Audience, is from the Advertiser's website. In order to create a "website Custom Audience" an Advertiser's website must have an active Meta Pixel.[9]

---

[7] Facebook, About Customer Audiences, https://www.facebook.com/business/help/744354708981227?id=2469097953376494 (last visited Jan. 18, 2023).

[8] Facebook, About Lookalike Audiences, https://www.facebook.com/business/help/164749007013531?id=401668390442328 (last visited Jan. 18, 2023).

[9] Facebook, Create a Website Custom Audience, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494 (last visited Jan. 18, 2023).

52.     The Meta Pixel is offered to advertisers, like Rite Aid, to integrate into their websites. Once installed on a website, "the [P]ixel will log when someone takes an action on [that] website."[10] As Facebook explains, "[t]he Meta Pixel receives information about the actions, or events, that take place on [an advertiser's] website."[11] Automatic events are a category of actions that the Meta Pixel collects and transmits from the website where it is installed without the advertiser being required to add any additional code.[12] The collection and transmission of automatic events is sufficient for an Advertiser to create a Custom Audience and, consequently, a Lookalike Audience. Advertisers are also able to select from a set of Standard events, predefined by Facebook, which can also be collected and transmitted by the Meta Pixel, including, for example, what content a visitor views, subscribes to, or purchases.[13] Finally, Advertisers are able to create their own "custom events" to be tracked and transmitted to Facebook by the Meta Pixel.[14]

53.     When a user accesses a website hosting a Meta Pixel, Facebook's software script surreptitiously directs the user's computing device to send a separate message to Facebook's servers. This second transmission, completely invisible and unknown to the user, contains the content of the original request sent to the host website ("GET request"), along with the data that the Meta Pixel was configured to collect ("POST request"). GET and POST requests are communications that contain contents from both the user and from servers associated with the website they are visiting. These transmissions are initiated by Meta code and concurrent with the communications to and from the host website.

---

[10] Facebook, About Meta Pixel, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Jan. 18, 2023).

[11] Facebook, About Automatic Events, https://www.facebook.com/business/help/1292598407460746?id=1205376682832142 (last visited Jan. 18, 2023).

[12] *Id.*

[13] Facebook, Specifications for Meta Pixel Standard Events, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited Jan. 18, 2023).

[14] Facebook, About Standard and Custom Website Events, https://www.facebook.com/business/help/964258670337005?id=1205376682832142 (last visited Jan. 18, 2023).

54.     The Meta Pixel acts as a conduit of information, sending the information it collects to Meta through scripts running in the user's web browser. The information is sent in data packets labelled with personally identifiable information, <u>including the user's IP address</u>.

55.     Meta associates the information it obtains via Meta Pixel with other information regarding the user, using additional personal identifiers that are transmitted concurrently with other personal information the Pixel is configured to collect. If the user has a Facebook account, these identifiers include the "c_user" IDs, which allow Meta to link data to a particular Facebook account, and "xs" cookies associated with a browsing session. For both Facebook account-holders and users who do not have a Facebook account, these identifiers also include cookies that Meta ties to their browser, such as "datr" and "fr" cookies.[15]

56.     The c-user cookie is a means of identification for Facebook users. The c_user cookie value is the Facebook equivalent of a user identification number. Each Facebook user account has a unique c_user cookie. Facebook uses the c_user cookie to record user activities and communications.

57.     Any computer user can find the Facebook account associated with a particular c-user cookie. One simply needs to log-in to Facebook, then type www.facebook.com/[c-user cookie]. For example, the c-user cookie for Mark Zuckerberg is 4. Logging in to Facebook and typing www.facebook.com/4 in the web browser will retrieve Mark Zuckerberg's Facebook page.

58.     The _datr cookie identifies the patient's specific web browser from which the patient is sending the communication. It is an identifier that is unique to the patient's specific web browser and is therefore a means of identification for Facebook users and non-users. Facebook keeps a record of every _datr cookie identifier associated with each of its users.

59.     The _fr cookie is a Facebook identifier that is an encrypted combination of the c_user and _datr cookies.

60.     Meta warns developers and those who incorporate the Meta Pixel into their website that the Meta Pixel is a personal identifier because it "relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts."[16]

61.     The Meta Pixel also automatically captures and discloses the IP address of the user. IP addresses are used to identify and route communications on the Internet. IP addresses of individual

---

[15] Meta, *Cookies Policy* (Oct. 5, 2022), https://www.facebook.com/policy/cookies.

[16] Facebook, Get Started, https://developers.facebook.com/docs/meta-pixel/get-started (last visited Jan. 18, 2023).

Internet users are used by websites and tracking companies to facilitate and track Internet communications. Individual homes and their occupants can be, and are, tracked and targeted with advertising using IP addresses. Thus, IP addresses are personally identifiable, particularly in combination with other information disclosed through the Meta Pixel.

*Defendant Disclosed Plaintiffs' and Class Members' Medical Information to Meta and Used Plaintiffs' and Class Members' Medical Information for its Own Purposes*

62.  Starting on date unknown and continuing to the present, Defendant embedded the Meta Pixel on and throughout its website and transmitted Medical Information shared by Plaintiffs and Class Members, without their consent, to Meta in accordance with the Meta Pixel's configuration.

63.  Rite Aid installed the Meta Pixel on its website – www.riteaid.com. When a Plaintiff or another Class Member visited that website and completed the steps necessary to make a vaccination appointment, the Meta Pixel automatically caused the Plaintiff's or Class Member's personal identifiers, including IP addresses and the c_user, _fr, _datr, and _fbp cookies, to be transmitted to Meta, attached to the fact that the Plaintiff or Class Member had visited the website and the titles of the webpages the Plaintiff or Class Member visited.

64.  Rather than merely transmit the "automatic events" that the Meta Pixel automatically collects and transmits from a website without the website owner or developer being required to add any additional code, on information and belief, Defendant intentionally configured the Meta Pixel on its website to track, collect, and disclose "custom events" such as:

a.  the time of the vaccination appointment, and, on information and belief, the ID number of the Rite Aid store at which the appointment was made;

b.  certain personal information entered by Class Members the state of their street address, sex assigned at birth, and race;

c.  answers given by Class Members on the "Vaccine history" page, including answers to questions such as: "Do you have allergies to medications, food (e.g. eggs), latex or any vaccine component (e.g. neomycin, formaldehyde, gentamicin, thimerosal, bovine protein, phenol, polymyxin, gelatin, baker's yeast or yeast)?" "Have you received a vaccine in the past 4 weeks?" "Have you ever had a serious reaction after receiving a vaccination?" "Do you have a neurological disorder such as seizures or other disorders that affect the brain or have had a disorder that resulted from a vaccine (e.g. Guillain-Barre Syndrome)?" "Have you had a pneumococcal vaccine? (You may need two different pneumococcal shots.)"

"Have you had a shingles vaccine?" "Have you had a whooping cough (Tdap/Td) vaccine?";

d.   answers given by Class Members on the "Health information" page, including answers to questions such as: "Do you have any long-term health problems with heart disease, kidney disease, metabolic disorder (e.g. diabetes), anemia , or blood disorders?" "Do you have a long term health problem with lung disease or asthma?" "Do you have cancer, leukemia, AIDS, or any other immune system problem? (In some circumstances you may be referred to your physician.)" "Do you take prednisone, other steroids, or anticancer drugs, or have you had radiation treatments?" "During the past year, have you received a transfusion of blood or blood products, including antibodies?" "Do you use any nicotine products?"; and,

e.   answers given by Class Members on the "Caregiving & Pregnancy" page to the questions: "Are you a parent, family member, or caregiver to a newborn infant?" "Are you pregnant or could you become pregnant in the next three months?"

65.   Moreover, the Meta Pixel on Defendant's website was also intentionally configured or authorized to use a feature called "automatic advanced matching." That feature scans forms on a website looking for fields that may contain personally identifiable information like a first name, last name, or email address, and then causes that information to be disclosed to Meta. On Defendant's website this feature collected, at a minimum, the first names and last names of Plaintiffs and other Class Members entered on the Recipient Information page of the vaccination scheduling tool.

66.   The data collected by the automatic advanced matching feature is disclosed to Meta in an obfuscated form know as a "hash." But Meta is able to determine the pre-obfuscated version of the data. Indeed, Meta uses the hashed information to link other data collected and disclosed by the Meta Pixel to Plaintiffs' and Class Members' Facebook and Instagram profiles.

67.   Thus, put simply, when Plaintiffs or other Class Members used Defendant's website to schedule a vaccination appointment, their identities, personal identifiers, and health information (together their Medical Information) was disclosed to Meta.

68.   On information and belief, Defendant disclosed Plaintiffs' and Class Members' Medical Information to Meta in order to permit Defendant to improve its marketing and advertising, in order to increase Defendant's revenues and profits. Thus, Defendant used Plaintiffs' and Class Members' Medical Information for its own marketing and advertising purposes, in an attempt to increase its own revenues and profits.

***Defendant Used and Disclosed Plaintiffs' and Class Members' Medical Information Without Plaintiffs' or Class Members' Knowledge, Consent, Authorization, or Further Action***

69.     The tracking tools incorporated into, embedded in, or otherwise permitted on Defendant's website were invisible to Plaintiffs and Class Members while using that website. The Meta Pixels on Defendant's website were seamlessly integrated into the website such that there was no reason for Plaintiffs or any Class Member to be aware of or to discover their presence.

70.     Plaintiffs and Class Members were shown no disclaimer or warning that their Medical Information would be disclosed to any unauthorized third party without their express consent.

71.     Plaintiffs and Class Members had no idea that their Medical Information was being collected and transmitted to an unauthorized third party.

72.     Because Plaintiffs and Class Members had no idea of the presence of Meta Pixels on Defendant's website, or that their Medical Information would be collected and transmitted to Meta, they could not and did not consent to Rite Aid's conduct.

73.     Plaintiffs and Class Members did not give consent or authorization for Defendant to disclose their Medical Information to Meta or to any third party for marketing purposes.

74.     Moreover, Defendant's Notice of Privacy Practices, as described above, provided no indication to Plaintiffs or Class Members that their Medical Information would be disclosed to Meta or any unauthorized third party.

***Plaintiffs and Class Members Had a Reasonable Expectation of Privacy in the Medical Information they Provided to Defendant***

75.     Plaintiffs and Class Members had a reasonable expectation of privacy in their Medical Information.

76.     Information such as the Medical Information provided by Plaintiffs and other Class Members to Defendant is protected by numerous state statutes throughout the United States.

77.     For example, information such as the Medical Information provided by Plaintiffs and other Class Members to Defendant is protected by California law under the Confidentiality of Medical Information Act (CMIA). Cal. Civ. Code §§ 56, *et seq.*

78.     Pursuant to Cal. Civ. Code § 56.05(i), "medical information," for the purposes of the CMIA is defined as "any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care, health care service plan, pharmaceutical company, or contractor regarding a patient's medical history, mental health application information, mental or physical condition, or treatment." Section 56.06(i) further provides: "'Individually identifiable' means

that the medical information includes or contains any element of personal identifying information sufficient to allow identification of the individual, such as the patient's name, address, electronic mail address, telephone number, or social security number, or other information that, alone or in combination with other publicly available information, reveals the identity of the individual."

79.     As another example, information such as the Medical Information provided by Plaintiffs and other Class Members to Defendant is protected by Washington law under the Uniform Health Care Information Act. Rev. Code Wash. ch. 70.02.

80.     Pursuant to Rev. Code. Wash. § 70.02.010(17), "Health care information," for the purposes of Washington's Uniform Health Care Information Act is defined as "any information, whether oral or recorded in any form or medium, that identifies or can readily be associated with the identity of a patient and directly relates to the patient's health care, including a patient's deoxyribonucleic acid and identified sequence of chemical base pairs. The term includes any required accounting of disclosures of health care information." Section 70.02.010(15) further provides; "'Health care' means any care, service, or procedure provided by a health care provider: (a) To diagnose, treat, or maintain a patient's physical or mental condition; or (b) That affects the structure or any function of the human body."

81.     Information such as the Medical Information provided by Plaintiffs and other Class Members to Defendant is also protected by the HIPAA Privacy Rule.

82.     The Health Insurance Portability and Accountability Act's Privacy Rule (HIPAA), 45 C.F.R. §§ 160.103 *et seq*., protects patient health information. HIPAA sets national standards for safeguarding "protected health information." For example, HIPAA limits the permissible uses of protected health information and prohibits disclosure of this information without explicit authorization. *See* 45 C.F.R. § 164.502. HIPAA also requires that covered entities, such as Defendant, implement appropriate safeguards to protect this information. *See* 45 C.F.R. § 164.530(c)(1).

83.     Recent HHS guidance on the technologies at issue here also states that online tracking technologies (including the Meta Pixel) that disclose protected health information (PHI) violate HIPAA. The guidance states that covered entities, such as Rite Aid, "**are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.** For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures."[17]

---

[17] U.S. Department of Health and Human Services, Office of Civil Rights, <u>Use of Online Tracking</u>

84.     Thus, state and federal laws and HHS guidance reinforce the social norms and general expectation that individually-identifiable health information is to be kept private and confidential.

85.     Accordingly, Plaintiffs and Class Members had a reasonable expectation of privacy regarding their Medical Information.

86.     Privacy polls and studies also uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares that individual's data.

87.     For example, a recent study by *Consumer Reports* shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[18] Moreover, according to a study by *Pew Research Center*, a majority of Americans, approximately 79%, are concerned about how data is collected about them by companies.[19]

88.     And privacy law experts have expressed concerns about the disclosure to third parties of a users' sensitive medical information, in particular. For example, Dena Mendelsohn – the former Senior Policy Counsel at Consumer Reports and current Director of Health Policy and Data Governance at Elektra Labs – explained that having one's personal health information disseminated in ways one is unaware of could have serious repercussions, including affecting one's ability to obtain life insurance and how much one pay for that coverage, increasing the rate one is charged on loans, and leaving one vulnerable to workplace discrimination.[20]

---

Technologies by HIPAA Covered Entities and Business Associates (content last reviewed Dec. 1, 2022) (emphasis in the original), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html#ftnref9 (last visited, Mar. 23, 2023).

[18] Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumerreports/ consumers-less-confident-about-healthcare-data-privacy-and-car-safety/.

[19] Americans and Privacy: Concerned, Confused, and Feeling Lack of Control Over Their Personal Information, PEW RESEARCH CENTER, (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confusedand-feeling-lack-of-control-over-their-personal-information/.

[20] Donna Rosato, *What Your Period Tracker App Knows About You*, CONSUMER REPORTS (Jan. 28, 2020), https://www.consumerreports.org/health-privacy/what-your-period-tracker-app-knows-about-you/.

***The Medical Information that Defendant Disclosed to Meta is Plaintiffs' and Class Members' Property, Has Economic Value, and its Unauthorized Disclosure Caused Economic Harm***

89.     It is common knowledge that there is an economic market for consumers' personal data – including the Medical Information that was disclosed by Defendant to Meta.

90.     In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender, and location" information are sold for about "$0.50 per 1,000 people."[21] This estimate was based upon "industry pricing data viewed by the Financial Times," at the time.[22]

91.     In 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30 per name."[23] That same report noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data (within the corporate acquisition context) can vary from $15 to more than $40 per user.[24]

92.     In 2021, a report from *Invisibly* found that personal medical information is one of the *most valuable pieces of data* within the data-market. "It's worth acknowledging that because health care records often feature a more complete collection of the patient's identity, background, and personal identifying information (PII), health care records have proven to be of particular value for data thieves. While a single social security number might go for $0.53, a complete health care records sells for $250 on average. For criminals, the more complete a dataset, the more potential value they can get out of it. As a result, health care breaches increased by 55% in 2020."[25]

93.     Moreover, health information has value to consumers. According to the annual Financial Trust Index Survey, conducted by the University of Chicago's Booth School of Business and Northwestern University's Kellogg School of Management, which interviewed more than 1,000

---

[21] Emily Steel, et al., *How much is your personal data worth?*, FIN. TIMES (June 12, 2013), https://ig.ft.com/how-much-is-your-personal-data-worth/#axzz3myQiwm6u.

[22] *Id.*

[23] Pauline Glickman and Nicholas Glady, *What's the Value of Your Data?*, TECHCRUNCH (Oct. 13, 2015), https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/.

[24] *Id.*

[25] *How Much is Your Data Worth? The Complete Breakdown for 2021*, INVISIBLY.COM (July 13, 2021), https://www.invisibly.com/learn-blog/how-much-is-data-worth/.

Americans, 93 percent would not share their health data with a digital platform for free. Half of the survey respondents would only share their data for $100,000 or more, and 22 percent would only share their data if they received between $1,000 and $100,000.[26]

94.    Given the existence of a market for the Medical Information disclosed by Defendant, Defendant has deprived Plaintiffs and Class Members of the economic value of their Medical Information by disclosing such data without authorization and without providing proper consideration for Plaintiffs' and other Class Members' property.

## TOLLING, CONCEALMENT, AND ESTOPPEL

95.    Any applicable statutes of limitation have been tolled by Defendant's knowing and active concealment of its incorporation of the Meta Pixel into its website.

96.    The Meta Pixel and other tracking tools on Defendant's website were and are entirely invisible to a website visitor.

97.    Through no fault or lack of diligence, Plaintiffs and Class Members were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

98.    Plaintiffs were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their part.

99.    Defendant had exclusive knowledge that its website incorporated the Meta Pixel and other tracking tools and yet failed to disclose to customers, including Plaintiffs and Class Members, that by booking vaccination appointments through Defendant's website Plaintiffs' and Class Members' Medical Information would be disclosed or released to Meta.

100.    Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its customers' Medical Information. In fact, to the present Defendant has not conceded, acknowledged, or otherwise indicated to its customers that it has disclosed or released their Medical Information to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

101.    Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

---

[26] Andrea Park, *How much should health data cost? $100K or more, according to patients*, Becker's Hosp. Rev. (Feb. 12, 2020), https://www.beckershospitalreview.com/healthcare-information-technology/how-much-should-health-data-cost-100k-or-more-according-to-patients.html.

102. The earliest that Plaintiffs or Class Members, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of this Complaint.

## ALLEGATIONS SPECIFIC TO PLAINTIFFS

103. In or about April 2021, Plaintiff Jane Doe I visited Rite Aid's website, while in California, and made an appointment for a vaccination.

104. In or about March 2021, Plaintiff Jane Doe II visited Rite Aid's website, while in California, and made an appointment for a vaccination.

105. In or about April 2022, Plaintiff Jane Doe III visited Rite Aid's website, while in California, and made an appointment for a vaccination.

106. In or about October 2022, Plaintiff Jane Doe IV visited Rite Aid's website, while in California, and made an appointment for a vaccination.

107. Plaintiffs' Medical Information was disclosed to Meta.

108. Plaintiffs would not have used Rite Aid's website to make a vaccination appointment had they known that their Medical Information would be disclosed to unauthorized third parties.

109. Plaintiff Jane Doe I, Plaintiff Jane Doe II, Plaintiff Jane Doe III, and Plaintiff Jane Doe IV, each believed that because they were on the website of a healthcare provider and pharmacy, their respective Medical Information would be protected and kept confidential.

110. None of the Plaintiffs saw anything on Defendant's website that suggested to any of them that their respective Medical Information would be disclosed or released to an unauthorized third party.

111. Plaintiff Jane Doe I, Plaintiff Jane Doe II, Plaintiff Jane Doe III, and Jane Doe IV, respectively, did not authorize, consent to, or otherwise encourage or permit the release of their Medical Information to Meta or any other third party.

## CLASS ACTION ALLEGATIONS

112. Plaintiffs bring this action, on behalf of themselves and all others similarly situated, as a class action pursuant to Code of Civil Procedure § 382. Plaintiffs seek to represent two Classes, defined as follows:

The California Class

"All natural persons residing in California who used Defendant's website to make a vaccination appointment and whose Medical Information was disclosed or transmitted to Meta or any other unauthorized third party."

The Nationwide Class

"All natural persons who used Defendant's website to make a vaccination appointment and whose Medical Information was disclosed or transmitted to Meta or any other unauthorized third party."

113.    Plaintiffs reserve the right to revise or amend the above Class definitions and to add subclasses based on facts learned in discovery.

114.    This action has been brought and may be properly maintained as a class action under the Code of Civil Procedure § 382 because there is a well-defined community of interest in the litigation, the proposed Classes are easily ascertainable, and Plaintiffs are proper representatives of the Classes.

115.    Numerosity. The potential members of each of the proposed Classes, as defined, are more than one million, and so numerous that joinder of all members of each Class is impracticable.

116.    Typicality. Plaintiffs' claims are typical of the claims of each of the Classes. Plaintiff Jane Doe I, Plaintiff Jane Doe II, Plaintiff Jane Doe III, and Plaintiff Jane Doe IV, all used Defendant's website to make a vaccination appointment and, on information and belief, their Medical Information was disclosed or transmitted to Meta or another unauthorized third party.

117.    Commonality. Common questions of fact and law exist as to all members of each Class and predominate over the questions affecting only individual members of each Class. These common questions include but are not limited to:

a.    Whether Defendant's acts and practices violated Plaintiffs' and Class Members' privacy rights;

b.    Whether Defendant's acts and practices violated California's Constitution, Art. 1, § 1;

c.    Whether Plaintiffs and Class Members had a reasonable expectation that their Medical Information would not be disclosed to third parties without authorization;

d.    Whether Defendant's acts and practices violated the California Confidentiality of Medical Information Act, Civil Code §§ 56 *et seq*.;

e.    Whether the Medical Information disclosed by Defendant constitutes "medical information" within the meaning of Civil Code § 56.05(i);

f.    Whether Defendant obtained written consent to or permission for its conduct;

g.    Whether Defendant's acts and practices violated the California Invasion of Privacy Act, Penal Code §§ 630, *et seq.*;

h.    Whether Defendant obtained express consent to or authorization for its conduct;

i.    Whether Defendant's acts and practices violated the Electronic Communications Privacy Act, 18 U.S.C. § 2510 *et seq*.;

j.    Whether Plaintiffs and Nationwide Class Members consented to the interception of their electronic communications with Rite Aid by Meta or any other unauthorized third party;

k.      Whether Defendant breached its contractual promise to safeguard and not secretly disclose Class Members' Medical Information;

l.      Whether Defendant breached its implied contractual promise to safeguard and not disclose Class Members' Medical Information without authorization or consent;

m.      Whether Defendant's acts and practices violated Business and Professions Code §§ 17200, *et seq.*;

n.      Whether Defendant's acts and practices harmed Plaintiffs and Class Members;

o.      Whether Plaintiffs and other Class Members are entitled to equitable relief, including but not limited to, restitution and disgorgement;

p.      Whether Plaintiffs and other Class Members are entitled to injunctive relief;

q.      Whether Plaintiffs and other Class Members are entitled to damages and other monetary relief; and

r.      Whether Plaintiffs and Class Members are entitled to reasonable attorneys' fees and costs.

118.    <u>Adequacy of Representation</u>. Plaintiffs are members of both Classes and will fairly and adequately represent and protect the interests of each Class. Plaintiffs' interests do not conflict with those of Nationwide or California Class Members, they have no conflict of interest with other Class Members, are not subject to any unique defenses, and have retained competent and experienced counsel.

119.    <u>Superiority of Class Action</u>. Class action treatment is superior to any alternative to ensure the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single form simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail. If this action is not certified as a class action, it will be impossible as a practical matter for many or most Class Members to bring individual actions to recover money from Defendant, due to the relatively small amounts of such individual recoveries relative to the costs and burdens of litigation. Moreover, individual Class Members do not have a significant interest in controlling the prosecution of separate actions. Plaintiffs anticipate no difficulty in the management of this action which would preclude its maintenance as a class action.

120.    Plaintiffs reserve the right to add representatives for each Class, provided Defendant is afforded an opportunity to conduct discovery as to those representatives.

//

## FIRST CAUSE OF ACTION

### Common Law Invasion of Privacy – Intrusion into Private Matters

### [On Behalf of all Plaintiffs and the California Class]

121.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

122.    Rite Aid's secret disclosure of Plaintiffs' and other California Class Members' Medical Information, including each California Class Member's first name, last name, other individually identifying information, information about their vaccine history, and information about their medical history, mental and physical condition, and treatment, constitutes an intentional intrusion upon Plaintiffs' and California Class Members' private matters that were intended to stay private from third parties.

123.    Plaintiffs and California Class Members had a reasonable expectation of privacy in their Medical Information. Plaintiffs and California Class Members did not consent to, authorize, or have any reason to know about Rite Aid's intrusion into their privacy at the time it occurred.

124.    Defendant's intrusion into Plaintiffs' and California Class Members' private affairs, seclusion, and solitude, would be highly offensive to a reasonable person.

125.    Plaintiffs and California Class Members expected that the Medical Information they shared with a provider of healthcare would not be disclosed to an unauthorized third party. Social norms and industry standards inform the understanding that Medical Information is highly protected and that disclosure of that information to third parties requires consent and authorization. The secret disclosure of Medical Information would be highly offensive to a reasonable person.

126.    Plaintiffs and California Class Members have been harmed as a result of Defendant's actions, including by, but not limited to, an invasion of their privacy rights.

127.    Plaintiffs and California Class Members seek appropriate relief for their injuries, including, but not limited to, monetary damages to compensate for the harm to their privacy interests and disgorgement of profits made by Rite Aid as a result of its intrusions into Plaintiffs' and California Class Members' private matters.

128.    Plaintiffs and California Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions which were directed at invading Plaintiffs' and California Class Members' privacy rights in conscious disregard of those rights. Such damages are necessary to deter Rite Aid from engaging in such conduct in the future.

129.    This action, if successful, will enforce an important right affecting the public interest and would confer a significant benefit on a large class of persons and/or the general public. Private

enforcement is necessary and places a disproportionate financial burden on Plaintiffs in relation to Plaintiffs' stakes in the matter. Because this case is brought for the purposes of enforcing important rights affecting the public interest, Plaintiffs also seek the recovery of attorneys' fees and costs in prosecuting this action against Defendant under Code of Civil Procedure § 1021.5 and other applicable law.

130.    Plaintiffs, on behalf of themselves and the California Class, request relief as further described below.

## SECOND CAUSE OF ACTION

### Invasion of Privacy and Violation of California Constitution, Art. 1, § 1

### [On Behalf of all Plaintiffs and the California Class]

131.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

132.    The right to privacy is enshrined in the California Constitution. Article 1, Section 1, provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

133.    Plaintiffs and Class Members did not consent to or authorize Rite Aid to disclose their Medical Information to unauthorized third parties. Indeed, Plaintiffs and Class Members had no knowledge that such information was being so disclosed and, consequently, had no opportunity to deny consent or authorization.

134.    Plaintiffs and California Class Members had a reasonable expectation of privacy in their personal information, identities, and Medical Information pursuant to Article 1, Section 1, of the California Constitution, social norms, and the expectations of privacy that attach to relationships and communications with providers of healthcare.

135.    Rite Aid's disclosure of Plaintiffs' and California Class Members' Medical Information constitutes an intentional invasion of private communications, information, and matters, and an egregious breach of social norms.

136.    Rite Aid's conduct would be highly offensive to a reasonable person because the data disclosed was highly sensitive and personal, as protected by the California Constitution, and Rite Aid lacked consent or authorization to disclose such information.

137.    Rite Aid's violation of the privacy rights of thousands of California Class Members, including Plaintiffs, without authorization or consent, constitutes an egregious breach of social norms.

138.    Plaintiffs and California Class Members have sustained damages and will continue to suffer damages as a result of Defendant's invasion of their privacy.

139.    Plaintiff and California Class Members seek appropriate relief for their injuries, including, but not limited to, monetary damages to compensate for the harm to their privacy interests and disgorgement of profits made by Rite Aid as a result of its intrusions into Plaintiffs' and California Class Members' private matters.

140.    Plaintiffs and California Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions which were directed at invading Plaintiffs' and California Class Members' privacy rights in conscious disregard of those rights. Such damages are necessary to deter Rite Aid from engaging in such conduct in the future.

141.    This action, if successful, will enforce an important right affecting the public interest and would confer a significant benefit on a large class of persons and/or the general public. Private enforcement is necessary and places a disproportionate financial burden on Plaintiffs in relation to Plaintiffs' stakes in the matter. Because this case is brought for the purposes of enforcing important rights affecting the public interest, Plaintiffs also seek the recovery of attorneys' fees and costs in prosecuting this action against Defendant under Code of Civil Procedure § 1021.5 and other applicable law.

142.    Plaintiffs, on behalf of themselves and the California Class, seek relief as further described below.

### THIRD CAUSE OF ACTION

**Violation of California Confidentiality of Medical Information Act, Cal. Civ. Code § 56.101**

**[On Behalf of all Plaintiffs and the California Class]**

143.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

144.    Cal. Civ. Code § 56.101(a) requires that every provider of health care "who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein."

145.    Section 56.101(a) further provides, in pertinent part: "Any health care provider who "negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to remedies and penalties provided under subdivisions (b) and (c) of Section 56.36."

146.    Rite Aid is, and all relevant times has been, a "provider of health care" within the meaning of §§ 56.101(a) and 56.05(m).

147.     Plaintiffs and California Class Members are "patients" as defined by Cal. Civ. Code § 56.05(j).

148.     Rite Aid is a provider of health care who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information, within the meaning of §§ 56.101(a) and 56.05(i).

149.     Rite Aid failed to maintain, preserve, and store Plaintiffs' and Class Members' medical information in a manner that preserves the confidentiality of the information contained therein because Rite Aid disclosed to Meta Plaintiffs' and Class Members' Medical Information, as defined and described in this Complaint, including their first names, last names, and information about their medical histories, physical conditions, mental conditions, and treatments.

150.     Rite Aid's failure to maintain, preserve, and store medical information in a manner that preserves the confidentiality of the information was, at a minimum, negligent, and violates Civil Code § 56.101(a).

151.     Accordingly, pursuant to Cal. Civil Code § 56.36, Plaintiffs and California Class Members are entitled to: (1) nominal damages of one thousand dollars ($1,000); (2) actual damages, in an amount to be determined at trial; and (3) statutory damages pursuant to Civil Code § 56.36(c); and (4) reasonable attorneys' fees and the costs of litigation.

152.     Plaintiffs, on behalf of themselves and the California Class, seeks relief as further described below.

## FOURTH CAUSE OF ACTION

### Violation of California Confidentiality of Medical Information Act, Cal. Civ. Code § 56.10.

### [On Behalf of all Plaintiffs and the California Class]

153.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

154.     Cal. Civil Code § 56.10(a) prohibits a health care provider, such as Rite Aid, from disclosing medical information without first obtaining an authorization, unless a statutory exception applies.

155.     Rite Aid disclosed medical information without first obtaining authorization when it disclosed to Meta Plaintiffs' and California Class Members' Medical Information, as defined and described in this Complaint, including their first names, last names, and information about their medical histories, physical conditions, mental conditions, and treatments. No statutory exception applies. As a result, Defendant violated Civil Code § 56.10(a).

156.    Rite Aid knowingly and willfully disclosed Plaintiffs' and California Class Members' medical information without consent to Meta for financial gain. Namely, to market and advertise its services, or to allow others to market and advertise their services, in violation of Civil Code § 56.10(a).

157.    At the least, Rite Aid negligently disclosed Plaintiffs' and California Class Members' medical information in violation of Civil Code § 56.10(a).

158.    Accordingly, pursuant to Cal. Civil Code § 56.35 and 56.36, Plaintiffs and California Class Members are entitled to: (1) nominal damages of one thousand dollars ($1,000); (2) actual damages, in an amount to be determined at trial; (3) statutory damages pursuant to Civil Code § 56.36(c); (4) punitive damages of three thousand dollars ($3,000) pursuant to § 56.35; and (5) reasonable attorneys' fees and the costs of litigation.

159.    Plaintiffs, on behalf of themselves and the California Class, seek relief as further described below.

### FIFTH CAUSE OF ACTION

**Violation of The Electronic Communications Privacy Act (ECPA), 18 U.S.C. §§ 2510 *et seq*.**

**[On Behalf of all Plaintiffs and the Nationwide Class]**

160.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

161.    The ECPA, 18 U.S.C. §§ 2510 *et seq*., makes it unlawful for a "person" to "intentionally intercept[], endeavor[] to intercept, or procure[] any other person to intercept or endeavor to intercept, any wire, oral, or electronic communications." 18 U.S.C. § 2511(1).

162.    "Intercept" is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

163.    "Contents" is defined as "includ[ing] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

164.    "Person" is defined as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation." 18 U.S.C. § 2510(6).

165.    "Electronic communication" is defined as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce . . . ." 18 U.S.C. § 2510(12).

166.    Plaintiffs' and Nationwide Class Members' communications with Rite Aid through Rite Aid's website during which Plaintiffs and Nationwide Class Members' made vaccination appointments and through which they communicated Medical Information with Rite Aid were electronic communications within the meaning of the ECPA.

167.    Both Meta and Rite Aid are persons within the meaning of the ECPA as they are corporations.

168.    The Meta Pixel is a "device or apparatus" that is "used to intercept a wire, oral, or electronic communication." 18 U.S.C. 2510(4).

169.    By incorporating the Meta Pixel into its website and permitting it to intercept Plaintiffs' and Nationwide Class Members' Medical Information, Rite Aid intercepted or endeavored to intercept Plaintiffs' and Nationwide Class Members' electronic communications and/or procured Meta to intercept or endeavor to intercept Plaintiffs' and Nationwide Class Members' electronic communications, in violation of the ECPA.

170.    18 U.S.C. § 2511(2)(d) provides an exception to 18 U.S.C. § 2511(1), under which: "It shall not be unlawful under this chapter [18 USCS §§ 2510 et seq.] for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." (emphasis added)

171.    Neither Plaintiffs nor the Nationwide Class Members consented to Rite Aid's interception of, or to Rite Aid procuring Meta to intercept, their electronic communications with Defendant through Defendant's website.

172.    Rite Aid does not meet the requirements of the "party exception" to the ECPA because the electronic communications intercepted by Rite Aid, or which Rite Aid procured Meta to intercept, were intercepted as part of Rite Aid's practice of divulging Medical Information to an unauthorized third party in violation of numerous federal and state laws.

173.    As detailed above, Rite Aid violated the CMIA and the California Constitution, and committed a tortious invasion of privacy, when it disclosed Plaintiffs' and California Class Members' Medical Information to Meta through the Meta Pixel. As detailed below, by those same acts, Rite Aid violated the California UCL.

174.    Moreover, Rite Aid violated the federal HIPAA Privacy Rule which regulates the use and disclosure of protected health information (PHI) by "covered entities."

175. Rite Aid is a "covered entity" within the meaning of 45 C.F.R. § 160.103.

176. "Disclosure" within the meaning of the HIPAA Privacy Rule is defined as "the release, transfer, provision of access to, or divulging in any manner of information outside the entity holding the information." 45 C.F.R. § 160.103.

177. The Medical Information provided by Plaintiffs and Nationwide Class Members to Rite Aid when they made vaccination appointments through Rite Aid's website, as described above, is PHI within the meaning of the HIPAA Privacy Rule. 45 C.F.R. § 160.103.

178. As described above, Rite Aid disclosed Plaintiffs' and Nationwide Class Members' PHI to Meta through the Meta Pixel incorporated into Rite Aid's website.

179. Rite Aid's disclosure of PHI to Meta was neither permitted nor required within the meaning of 45 C.F.R. § 164.502(a). Rather, Rite Aid disclosed Plaintiffs' and Nationwide Class Members' PHI to Meta for impermissible purposes, including marketing and advertising.

180. Thus, Rite Aid committed a tortious act in violation of the federal HIPAA Privacy Rule when it disclosed Plaintiffs' and Nationwide Class Members' PHI to Meta through the Meta Pixel.

181. Moreover, pursuant to 42 U.S.C. § 1320d-6, it is a crime for a "person," such as Rite Aid, to knowingly disclose "individually identifiable health information" to a third party for "commercial reasons. Thus, Rite Aid committed criminal acts when it knowingly disclosed Plaintiffs' and Nationwide Class Members' PHI to Meta through the Meta Pixel.

182. On information and belief, Rite violated numerous other federal and state statutes when it intercepted or endeavored to intercept Plaintiffs' and Nationwide Class Members' electronic communications and/or procured Meta to intercept or endeavor to intercept Plaintiffs' and Nationwide Class Members' electronic communications.

183. Accordingly, Rite Aid violated the ECPA each time the Meta Pixel incorporated into its website intercepted Plaintiffs' and Nationwide Class Members' electronic communications.

184. Pursuant to 18 U.S.C. § 2520, Plaintiffs and Nationwide Class Members have been damaged by the interception and disclosure of their electronic communications in violation of the ECPA and are entitled to: (1) appropriate equitable or declaratory relief; (2) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiffs and the Nationwide Class and any profits made by Rite Aid as a result of its violations, or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; and (3) reasonable attorneys' fees and other litigation costs reasonably incurred.

185.    Plaintiffs, on behalf of themselves and the Nationwide Class, seek relief as further described below.

## SIXTH CAUSE OF ACTION

### Violation of California Invasion of Privacy Act (CIPA), California Penal Code §§ 630, *et seq*.

### [On Behalf of all Plaintiffs and the California Class]

186.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

187.    The California Invasion of Privacy Act begins with its statement of purpose: "The legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society. The Legislature by this chapter intends to protect the right of privacy of the people of this state." Cal. Penal Code § 630.

188.    Cal. Penal Code § 631(a) provides, in pertinent part: "Any person who, by means of any machine, instrument, or contrivance, or in any other manner, intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500) . . ."

189.    Defendant is a "person" within the meaning of Cal. Penal Code § 631.

190.    The Meta Pixel and Plaintiffs' and California Class Members' browsers, and Plaintiffs' and California Class Members' computing and mobile devices qualify as a "machine, instrument, contrivance or . . . other manner" under this statute.

191.    Plaintiffs' and California Class Members' communications of Medical Information with Defendant on and through Defendant's website were intended to be confined to the parties. Plaintiffs and

California Class Members were using what they understood to be Defendant's secure appointment scheduling tool and secure website and no indication was given that their Medical Information would be shared with or viewed by any unauthorized third party. The circumstances reasonably indicate that Plaintiffs and California Class Members desired their communications with Defendant to be confined to the parties thereto.

192.    Despite not having any authorization from Plaintiffs or other California Class Members, Defendant aided, agreed with, or conspired with Meta, to permit Meta to intercept these communications and to learn the content of those communications while in transit or in the process of being sent or received.

193.    Defendant's conduct, as described above, violated Penal Code § 631. Under Penal Code § 637.2, Plaintiffs and California Class Members are entitled to recover the greater of: (1) five thousand dollars ($5,000) per violation; or (2) three times the amount of actual damages according to proof at trial, as well as injunctive or other equitable relief.

194.    Plaintiffs and California Class Members have also suffered irreparable injury from these unauthorized acts of disclosure. Their personal, private, and sensitive Medical Information has been collected, viewed, accessed, stored, and used by Meta, and has not been destroyed. Due to the continuing threat of such injury, Plaintiffs and California Class Members have no adequate remedy at law and are entitled to injunctive relief. Plaintiffs and Class Members seek a permanent injunction under Penal Code § 637.2 enjoining Defendant from engaging in further conduct in violation of Cal. Penal Code § 630, *et seq*.

195.    Plaintiffs, on behalf of themselves and the California Class, seek relief as further described below.

## SEVENTH CAUSE OF ACTION

### Breach of Contract

### [On Behalf of all Plaintiffs and the Nationwide Class]

196.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

197.    In its Notice of Privacy Practices, as described above, Defendant set out specific limited purposes for which it would use or disclose Plaintiffs' and Class Members' Medical Information.

198.    Defendant's disclosure of Plaintiffs' and Class Members' Medical Information to Meta does not fall within any required or permissible uses or disclosures that Defendant set out in its Notice of Privacy Practices.

199.     Moreover, Defendant specifically promised: "We will obtain your written Authorization before using or disclosing protected health information about you for marketing purposes, to sell your protected health information, or for purposes other than those listed above or otherwise permitted or required by law."

200.     Plaintiffs and other Class Members did not provide any written authorization for Defendant to disclose their Medical Information to Meta or to use their Medical Information for Defendant's own marketing purposes.

201.     Plaintiffs and other Class Members accepted Defendant's promises to protect their Medical Information in accordance with Defendant's Notice of Privacy Practices, and not to disclose their Medical Information to third parties without express consent or authorization, when they used Defendant's website to make vaccination appointments.

202.     Plaintiffs and Class Members fully performed their obligations under their contracts with Defendant, including entering their Medical Information into Defendant's website and using Defendant's website to make vaccination appointments.

203.     Defendant did not perform consistent with its obligations under the contract. Defendant secretly disclosed Plaintiffs' and Class Members' Medical Information to Meta in violation of Defendant's agreement with Plaintiffs and Class Members.

204.     As a direct and proximate result of Defendant's breaches of its contracts, Plaintiffs and Class Members sustained damages as alleged herein. Plaintiffs and Class Members would not have used Defendant's website to make a vaccination appointment or would not have entered their medical information into Defendant's website had they known their Medical Information would be disclosed.

205.     Plaintiff and Nationwide Class Members are entitled to compensatory and consequential damages as a result of Defendant's breach of contract.

206.     Plaintiffs, on behalf of themselves and the Nationwide Class, seek relief as further described below.

### EIGHTH CAUSE OF ACTION

**Breach of Implied Contract (in the alternative)**

**[On Behalf of all Plaintiffs and the Nationwide Class]**

207.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

208.     When Plaintiffs and Class Members used Defendant's website to make a vaccination appointment and entered their Medical Information in order to make that appointment, they entered

implied contracts pursuant to which Defendant agreed to safeguard and not disclose their Medical Information without authorization or consent.

209.    Plaintiffs and Class Members accepted Defendant's offers and provided their Medical Information to Defendant.

210.    Plaintiffs and Class members would not have entrusted Defendant with their Medical Information in the absence of an implied contract between them and Defendant obligating Defendant not to disclose this information without consent.

211.    Defendant breached these implied contracts by disclosing Plaintiffs' and Class Members' Medical Information to Meta.

212.    As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiffs and Class Members sustained damages as alleged herein. Plaintiffs and Class Members would not have used Defendant's website to make a vaccination appointment or would not have entered their medical information into Defendant's website had they known their Medical Information would be disclosed.

213.    Plaintiffs and Nationwide Class Members are entitled to compensatory and consequential damages as a result of Defendant's breach of implied contract.

214.    Plaintiffs, on behalf of themselves and the Nationwide Class, seek relief as further described below.

### NINTH CAUSE OF ACTION

### Violation of California Business & Professions Code §§ 17200 *et seq*. (UCL)

### [On Behalf of all Plaintiffs and the California Class]

215.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

216.    The UCL prohibits unfair competition in the form of any unlawful, unfair, or fraudulent business act or practice. Cal. Bus. & Prof. Code § 17204 allows "any person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL. Such a person may bring such an action on behalf of themselves and others similarly situated, who are affected by the unlawful, unfair, or fraudulent business practice or practices.

217.    Rite Aid's acts, omissions, practices, and non-disclosures as alleged herein constituted unlawful, unfair, and fraudulent business acts and practices within the meaning of Cal. Bus. & Prof. Code §§ 17200, *et seq*. (UCL).

218.    Defendant engaged in "unlawful" business acts and practices, as set forth above: in violation of the common law; in violation of the California Constitution; and in violation of California statutes, including the Confidentiality of Medical Information Act and the California Invasion of Privacy Act.

219.    Plaintiffs reserve the right to allege other violations of law committed by Defendant that constitute unlawful business acts or practices within the meaning of the UCL.

220.    Defendant has also engaged in "unfair" business acts and practices. California has a strong public policy of protecting consumers' privacy interests, including consumers' personal data. Rite Aid violated this strong public policy by, among other things, surreptitiously disclosing, releasing, and otherwise misusing Plaintiffs' and Class Members' Medical Information without Plaintiffs' and California Class Members' consent. Rite Aid's acts and practices violate the policies underlying the statutes and the article of the California Constitution referenced herein.

221.    Defendant's acts and practices are also "unfair" in that they are immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers. Defendant secretly disclosed, released, and otherwise misused Plaintiffs' and California Class Members' Medical Information, with no corresponding benefit to its affected customers. And, because consumers were unaware of Defendant's incorporation of tracking tools into its website and that Defendant would disclose and release their Medical Information to unauthorized third parties, they could not have avoided the harm.

222.    Had Plaintiffs and California Class Members known that their Medical Information would be disclosed or released by Defendant to unauthorized third parties, they would not have shared their Medical Information with Defendant's website or would not have used Defendant's website.

223.    The UCL also prohibits any "fraudulent business act or practice." Defendant's above-described nondisclosures and misleading statements were false, misleading, and likely to deceive the consuming public in violation of the UCL.

224.    Plaintiffs and California Class Members suffered injury in fact and lost money or property as a result of Defendant's acts and practices in that a portion of any money Plaintiffs and California Class Members paid for Defendant's services, including giving vaccinations, went to fulfill Defendant's obligations with respect to the confidentiality and security of Plaintiffs' and California Class Members' Medical Information, and Defendant failed to fulfill those obligations.

225.    Plaintiffs and California Class Members also suffered injury in fact as a result of Defendant's acts and practices because they paid more for Defendant's services than they otherwise would

have had they known Defendant was disclosing their Medical Information to unauthorized third parties in violation of its legal obligations, social norms, and reasonable consumer expectations.

226.    Plaintiffs and California Class Members have also suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) invasion of privacy; (ii) breach of the confidentiality of their Medical Information; and/or (iii) deprivation of the value of their Medical Information for which there is a well-established national and international market.

227.    Plaintiffs seek a declaration from the Court that Defendant's conduct alleged herein constitutes a violation of Bus. & Prof. Code §§ 17200 *et seq*. under the unlawful, unfair, and fraudulent prongs of the UCL.

228.    Absent injunctive relief from the Court, Defendant is unlikely to fully correct its illegal conduct. Defendant has not acknowledged its wrongful disclosure and release of Plaintiffs' and California Class Members' Medical Information, it has not announced any changes to its practices regarding its treatment of Plaintiffs' and California Class Members' Medical Information, and, on information and belief, it has not removed the offending tracking tools from its website. Plaintiffs seek an order from this Court for themselves, the California Class Members, and the general public, requiring Defendant to correct its illegal conduct and requiring Defendant to issue a comprehensive notice to affected consumers.

229.    Plaintiffs also seek restitution on behalf of themselves and the California Class.

230.    This action, if successful, will enforce an important right affecting the public interest and would confer a significant benefit on a large class of persons and/or the general public. Private enforcement is necessary and places a disproportionate financial burden on Plaintiffs in relation to Plaintiffs' stakes in the matter. Because this case is brought for the purposes of enforcing important rights affecting the public interest, Plaintiffs also seek the recovery of attorneys' fees and costs in prosecuting this action against Defendant under Code of Civil Procedure § 1021.5 and other applicable law.

231.    Plaintiffs, on behalf of themselves and the California Class, seek relief as further described below.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and other Class Members, pray for judgment against Defendant as follows:

232.    Ordering that this action may proceed and be maintained as a class action under § 382 of the Code of Civil Procedure; and defining the Classes as specified above and appointing Plaintiffs as Representatives of the Classes and their attorneys as Counsel for the Classes;

233.     Awarding Plaintiffs and California Class Members compensatory damages, disgorgement of profits, and punitive damages for Defendant's invasion of privacy and violation of Article 1, Section 1 of the California Constitution;

234.     Awarding Plaintiffs and California Class Members nominal damages of $1,000 per violation, or actual damages, and reasonable attorneys' fees and the costs of litigation, for Defendant's violations of California's Confidentiality of Medical Information Act, Cal. Civil Code § 56.101;

235.     Awarding Plaintiffs and California Class Members nominal damages of $1,000 per violation, or actual damages, punitive damages of $3,000 per violation, and reasonable attorneys' fees and the costs of litigation, for Defendant's violations of California's Confidentiality of Medical Information Act, Cal. Civil Code § 56.10;

236.     Awarding Plaintiffs and Nationwide Class Members appropriate equitable or declaratory relief, the greater of the sum of the actual damages suffered and any profits made by Rite Aid as a result of its violations, or statutory damages of whichever is the greater of $100 per day per violation or $10,000, and reasonable attorneys' fees and other litigation costs reasonably incurred, for Defendant's violations of the ECPA, 18 U.S.C. §§ 2510 *et seq.*;

237.     Awarding Plaintiffs and California Class Members statutory damages of $5,000 per violation, or three times the amount of actual damages, and injunctive relief for Defendant's violations of California's Invasion of Privacy Act, Penal Code §§ 630 *et seq.*;

238.     Awarding compensatory and consequential damages to Plaintiffs and Nationwide Class Members for Defendant's breach of contract or, in the alternative, Defendant's breach of implied contract;

239.     Declaring that Defendant's conduct alleged herein constitutes a violation of Bus. & Prof. Code §§ 17200 *et seq.* under the unlawful, unfair, and fraudulent prongs of the UCL;

240.     Awarding Plaintiffs and California Class Members restitution and injunctive relief for Defendant's violations of the UCL, Cal. Bus. & Prof. Code §§ 17200 *et seq.*;

241.     Awarding attorneys' fees and costs as authorized by statute and governing law, including Code of Civil Procedure § 1021.5; and

242.     Awarding such other and further relief, at law and in equity, as the nature of this case may require or as this Court deems just and proper.

//

//

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs, on behalf of themselves and other members of the Classes hereby demand a jury trial on all issues so triable.

DATED:   March 28, 2023          Respectfully submitted,


<u>/s/ Julian Hammond</u>
Julian Hammond
*Attorneys for Plaintiffs and the Putative Classes*